[Civ. No. 43293. Second Dist., Div. One. Jan. 23, 1975.]

WOODLAND HILLS RESIDENTS ASSOCIATION, INC., et al.,
Plaintiffs and Appellants, v.
CITY COUNCIL OF THE CITY OF LOS ANGELES et al.,
Defendants and Respondents;
CONSOLIDATED RESOURCES, INC.,
Real Party in Interest and Respondent.

826

**COUNSEL**

Antonio Rossmann for Plaintiffs and Appellants.

Burt Pines, City Attorney, Robert Thomson, Executive Assistant City Attorney, Claude E. Hilker, Assistant City Attorney, and Jerome Montgomery, Deputy City Attorney, for Defendants and Respondents.

Axelrad, Sevilla & Ross and Richard H. Levin for Real Party in Interest and Respondent.

## OPINION

WOOD, P. J.—Plaintiff Woodland Hills Residents Association, Inc., petitioned the superior court for a writ of mandamus compelling each respondent (city council, planning commission, advisory agency) to vacate its decision approving a tract map of a proposed subdivision to be made by Consolidated Resources, Inc., (real party in interest) in Woodland Hills. It may be stated generally that, in a hillside area of 38 acres, Consolidated proposed to cut approximately 90 feet from the top of a ridge and fill the adjacent valleys with 750,000 cubic yards of earth, thereby creating a mesa that would be subdivided into 123 lots upon which to construct 123 dwelling houses. Judgment was entered denying the petition. Woodland Hills Association (petitioner) appeals from the judgment.

Appellant (Association) contends that (1) the City Council of Los Angeles, the planning commission, and the advisory agency unlawfully approved the tract map by failing to find that it was consistent with the city's general plan, (2) the tract map is not consistent with the general plan, (3) an environmental impact report was not prepared prior to approval of the tract map, and (4) each respondent (council, planning commission, and advisory agency) failed to fulfill its duty under the California Environmental Quality Act.

In 1968, the owners of the real property (38 acres) filed with the advisory agency a tentative tract map. The map was approved conditionally by the agency; however, the owners did not file or record a final map within the time allowed therefor by section 11554 of the Business and Professions Code and by section 17.07 of the Los Angeles Municipal Code, and the conditional approval expired in June 1972.

On June 13, 1972, Consolidated filed with the advisory agency an application for approval of a tentative tract map of a proposed subdivision of the property; and the city engineer assigned to it the same number (28569) which had been assigned to the tentative map previously filed by owners. Consolidated proposed to grade 38 acres of hillside

terrain[1] and subdivide the graded land into 123 lots at a density of 3.3 lots to an acre. To accomplish that, Consolidated proposed, as hereinabove indicated, to cut 90 feet from the top of a ridge and fill the adjacent valleys with 750,000 cubic yards of earth, thereby creating a mesa that would be subdivided into 123 lots.

On July 13, 1972 (a month after Consolidated filed the tentative tract map with the agency), the city council approved a district plan, as a "part of the General Plan" of the city, subject to further hearing of proposed modifications (which were not relevant to the tract map herein). The district plan, referred to as the "Canoga Park-Winnetka-Woodland Hills District Plan" (district plan hereinafter) provided in part that objectives of the plan were to encourage preservation and enhancement of the varied and distinctive residential character of the district; in the hillside residential areas, to (a) minimize grading so as to retain the natural terrain and ecological balance and (b) provide a standard of land use intensity and population density which will be compatible with street capacity and topography in coordination with development in the remainder of the city; and to limit intensity of land use in the hillside areas and the density of population which can be accommodated thereon in accordance with the following criteria: (a) the adequacy of the existing street circulatory system, both within the area and in peripheral areas, (b) the availability of sewers, drainage facilities and other public facilities, and (c) the steepness of the topography of the various parts of the area, and the suitability of the geology of the area for development. It was also stated: "The Plan proposes that the low-density residential

---

[1]Petitioners' description of the terrain, as presented by petitioners to the city council, was:

"These prominent, rugged undeveloped hills dominate the view to the west from the Summit of Topanga Canyon Blvd. and at numerous points from there to the floor of the San Fernando Valley. They are also visible from the eastern limits of Tarzana when traveling west on Mulholland Drive. These hills are an integral part of the character and environment of Woodland Hills. Their natural beauty is why most of us have chosen to reside in the area and why homeowners have invested their time, energy and money here.

"The concern for these undeveloped hills and how they are to be developed is not limited to those of us who live in the immediate area or elsewhere in Woodland Hills. Widespread interest from the outside of Woodland Hills has made it apparent to us that the natural contour of these hills and their seasonal changes from green to gold have become a familiar landmark of beauty to many residing outside of Woodland Hills.

"The grading proposed in this plan would reduce the prominent, rugged ridge by 1/3 and fill the adjoining valley to create a mesa. A mesa that is incompatible with the other hills of Woodland Hills which have been developed in such a way as to preserve the natural contour."

character of the Canoga Park-Winnetka-Woodland Hills District be preserved, and that single-family residential neighborhoods be protected from encroachment by other types of uses. In the mountains and hillside areas all natural slopes not yet developed, and generally in excess of 15% have been designated for minimum density." (Minimum density is referred to as "0.5 to 1.0 units per acre.")

On July 31, 1972, the council adopted preliminary findings recommended by a report of the advisory agency that the proposed subdivision in tentative tract map No.. 28569 was "in accordance with the West San Fernando Valley Community Plan" and was consistent with the zoning plan that classifies the property in R-1 zone. (The West San Fernando Valley Community Plan was in existence prior to approval of the "Canoga Park-Winnetka-Woodland Hills District Plan" [district plan], hereinabove described. There was no finding or determination that the proposed subdivision was consistent with the district plan.) Said preliminary findings of the council were adopted by the council without affording notice or hearing to petitioners or to any landowner in the area of the proposed subdivision. The city attorney states (in his brief) that there is no requirement of notice for such "preliminary determination" by the agency and the council—that section 17.06 of the Municipal Code and section 11552.1 of the Business and Professions Code (enacted after preliminary finding was made herein) require notice, to the subdivider and property owners in the area, only of the advisory agency's hearing, and do not require notice of any preliminary determination by the agency or the council.

On August 9, 1972, the advisory agency mailed notices, to owners of land adjacent to the proposed subdivision, of a public hearing of Consolidated's application for approval of its tentative tract map. (The notice was the first notice given to any such owner of the proposed subdivision.)

On August 23, 1972, when the advisory agency held a public hearing, the petitioners appeared and opposed Consolidated's application on the grounds that the proposed subdivision was not consistent with the district plan; and that it would result in excess grading, environmental damage, and excess traffic burden on existing streets in the neighborhood. The agency approved the tentative tract map. (In an eight-page letter dated August 31, 1972, from the agency to Consolidated [and to other persons], the agency stated that it had approved the tentative tract map on August

23, 1972, on certain conditions set forth therein as to utilities, streets, damage, grading, etc.) The record does not show that the agency made any finding at or after the hearing that the proposed subdivision was consistent with the district plan.

On September 6, 1972, petitioners appealed to the planning commission from the action of the agency approving the tentative tract map. On September 15, 1972, while that appeal was pending, the council formally adopted, as part of the General Plan of the city, the district plan that it had approved on July 13, 1972 (district plan hereinabove described— "Canoga Park-Winnetka-Woodland Hills District Plan").

At the hearing of that appeal, petitioners objected to the proposed subdivision on the ground that it did not conform with the district plan, that it would result in excess grading, density, and traffic, and that the agency did not consider its impact upon the neighborhood. Also, one of the petitioners requested that the city prepare an environmental impact report on the project prior to approving it. On a motion to "deny the appeal" and to sustain the action of the agency (approving the subdivision), the planning commission allegedly voted "2 to 2." (See *infra.*) Upon a tie vote, petitioners' appeal would be "denied" by operation of law under sections 11552 and 11553 of the Business and Professions Code. The commission did not make findings. As a result, there was no express finding by the commission that the proposed subdivision was consistent with the district plan or the general plan. The commission did not require preparation of an environmental impact report.

Petitioners appealed to the city council from the planning commission's alleged approval of the proposed subdivision. On January 4, 1973, when the council held a public hearing on the appeal, petitioners made objections to the proposed subdivision which were similar to the objections that they made before the advisory agency and the planning commission. A councilman made a motion to "grant" the appeal (to disapprove the proposed subdivision) on the ground that excess grading and traffic would result therefrom. Before a vote was taken on that motion, a councilman proposed an amendment to the motion which would state that the density of the proposed subdivision "greatly exceeds" the provision of the district plan that all slopes in excess of 15 percent be designated for density of 0.5 to 1 dwelling unit per acre. By vote of eight to five, the motion to amend was carried. The vote on the

motion, as amended, was seven to seven. (Section 25 of the city charter provides that action shall be taken by majority vote of the entire membership of the council.) The appeal remained within the jurisdiction of the council for seven days, under provisions of section 11552, subdivision (b), of the Business and Professions Code.

On January 11, 1973, petitioners made a motion that the council reconsider petitioners' motion to "grant" the appeal. The motion was denied by vote of six to five. Thus, pursuant to sections 11552 and 11553 of the Business and Professions Code (above referred to), the subdivision was "deemed approved" by operation of law. The council did not make findings. As a result, there was no express findings by the council that the subdivision was consistent with the district plan which the council had adopted previously. The council did not require preparation of an environmental impact report.

Petitioners filed, in the superior court, this petition for a writ of mandamus compelling each of the respondents (council, planning commission, advisory agency) to vacate its decision approving the tract map. Evidence at the hearing of petition included many exhibits attached to the petition, the supplemental petition, the answer, and a memorandum submitted by the city in opposition to the petition; and included transcripts of hearings before the planning commission and the council. The court did not make signed findings. In a two-page minute order denying the petition, the court stated in part as follows:[2]

"The court finds that there is substantial evidence to support the implied findings and that there was no prejudicial abuse of discretion. . . . The actions of the Appeal Board [planning commission] and the City Council by each reaching a tie vote on motions to sustain the matter on appeal resulted in a denial of the appeals by operation of law. The tie vote in each case was an implied finding by the Appeal Board and the City Council that the appeal was not meritorious and that the decision of the lower body should stand. It is the opinion of the court that the

---

[2]Respondents state (in their brief) that findings were waived and that the minute order does not constitute findings. Appellants (in their reply brief) state that findings were not waived by written stipulation by counsel, and although respondents obtained judgment in their favor they did not present proposed findings of fact and conclusions of law. The record does not include a reporter's transcript of the court proceedings. Respondents do not cite the record for their statement that findings were waived. The minute order does not state that findings were waived—it states: "The Real Party in Interest is directed to prepare the Judgment."

wording of Section 1706A.3 and 4 [sic] [3] of the Los Angeles Municipal Code should be construed so that the word 'finding' includes the word 'decision'. This construction is supported by the wording of Section 1706A.3 and 4 [sic] [3] which states that the appellate body shall declare its findings, and may make such findings as are not inconsistent with 'this article or the Subdivision Map Act'. In addition the appellate body 'may sustain, modify, reject or overrule any recommendations or rulings . . .'. Implicit in such sustaining, modification, rejection or overruling is the power to make its own ruling or decision, as for example, to overrule the lower body which had denied approval and approve a subdivision map. It is also implicit that a decision or finding that the lower body's action is correct may be made by the casting of a tie vote by the appellate body. The administrative record contains substantial evidence to support such implied decision or finding. The finding of consistency of the proposed subdivision with the applicable general or specific plans of the city as required by Section 11526.2 of the Business and Professions Code is also made by implication by the tie votes. The question concerning the general plan as it existed in July of 1972 and as it existed at the time of the appellate hearings was thoroughly presented to the appellate bodies. The administrative record contains substantial evidence to support such finding of consistency by the City Council at each of the times involved. No notice to petitioners is required for a determination of consistency. Such decision or determination may be attacked as part of the general process of administrative appeal from approval of a tentative or final subdivision map, or in a court action upon exhaustion of such administrative remedies, i.e., the finding of consistency is part of, rather than separate from, the overall process of subdivision approval. The court finds that an Environmental Impact Report was not required. The 'moratorium' passed by the legislature concerning the California Environmental Quality Act exempted this project from the preparation of an Environmental Impact Report. The administrative appeals were not the 'judicial proceeding' referred to in Section 21171 of the Public Resources Code."

■ Appellant contends, as above stated, that respondents erred in approving the tract map in that each respondent (council, planning commission, and advisory agency) failed to find that the proposed subdivision was consistent with the general plan (i.e., that part of the

---

[3] Apparently, section 17.06, subdivision A, subsections 3 and 4, of the Los Angeles Municipal Code.

applicable general plan adopted by the council for the district herein, hereinabove referred to as district plan).

Section 11526, subdivision (c), of the Business and Professions Code, provides: "No city or county shall approve a tentative or final subdivision map unless the governing body shall find that the proposed subdivision, together with the provisions for its design and improvement, is consistent with applicable general or specific plans of the city or county."

Section 11526.2, subdivision (c), of said code provides: "The advisory agency, appeal board or governing body shall not approve a tentative or final subdivision map unless it first finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with applicable general or specific plans."

Section 11549.5, subdivision (a), of said code provides that the governing body of a city shall deny approval of a final or tentative subdivision map if it finds that the proposed map is not consistent with applicable general and specific plans.

In *Topanga Assn. For A Scenic Community* v. *County of Los Angeles,* 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12], decided after the opening brief was filed herein, the Supréme Court (p. 509) considered "aspects of the functions served by administrative agencies in the granting of zoning variances and of courts in reviewing these proceedings by means of administrative mandamus," and concluded (p. 510) that variance boards "must render findings to support their ultimate rulings" and that a reviewing court "must determine whether substantial evidence supports the findings of the administrative board and whether the findings support the board's action." In that case, a county regional planning commission, despite opposition by an association of taxpayers and owners of property in Topanga Canyon, granted to an investment company a variance to establish a 93-space mobile home park on 28 acres in the canyon. The association appealed "without success" to the board of supervisors and then sought relief by means of administrative mandamus, unsuccessfully, in the superior court. The Supreme Court held (pp. 513-514) that "regardless of whether the local ordinance commands that the variance board set forth findings, that body must render findings sufficient both to enable the parties to determine whether and on what basis they should seek review and, in the event of review, to

apprise the reviewing court of the basis for the board's action." It was said (p. 515) that "implicit in section 1094.5 [of the Code of Civil Procedure] is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." Also, it was said (p. 516) that "a findings requirement serves to conduce the administrative body to draw legally relevant sub-conclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions. [Citations.] In addition, findings enable the reviewing court to trace and examine the agency's mode of analysis. [Citations.] [¶] Absent such roadsigns, a reviewing court . . . would have to grope through the record to determine whether some combination of credible evidentiary items which supported some line of factual and legal conclusions supported the ultimate order or decision of the agency." It was said further (p. 517): "By setting forth a reasonable requirement for findings and clarifying the standard of judicial review, we believe we promote the achievement of the intended scheme of land use control. . . . Moreover, courts must meaningfully review grants of variances in order to protect the interests of those who hold rights in property nearby the parcel for which a variance is sought."

In *Selby Realty Co.* v. *City of San Buenaventura,* 10 Cal.3d 110, 125-126 [109 Cal.Rptr. 799, 514 P.2d 111], an application for a building permit was denied by a city for failure to comply with an ordinance that was in existence when the application was submitted. In the interim between denial of the permit and an appeal from the denial, the ordinance was amended. The Supreme Court held (p. 126) that the amended version of the ordinance was applicable to the request for a permit even though the ordinance was amended after the permit was denied. It was also said (p. 125, citing *Russian Hill Improvement Assn.* v. *Board of Permit Appeals,* 66 Cal.2d 34, 39 [56 Cal.Rptr. 672, 423 P.2d 824], that "even after a permit has been issued, it may be revoked by an administrative body on the basis of a subsequent change in the zoning laws unless the permittee has made substantial improvements in good faith reliance on the permit."

In the present case, Consolidated filed its application for approval of the tract map in June 1972; and on July 13, 1972, the city council approved, subject to further hearing of modifications, the district plan that included a provision that in hillside areas in the district all natural

slopes in excess of 15 percent be designated for minimum density of 0.5 to 1 dwelling unit per acre. On July 31, 1972, without notice or hearing to any party, the council adopted *preliminary* findings recommended by the advisory agent that the proposed subdivision was in accordance with the community plan that was in existence at that time. Then, the advisory agency gave notice (including notice to adjoining landowners) of a public hearing of Consolidated's application for approval of the subdivision tract map. At the hearing, petitioners (herein) opposed the application on the grounds that the proposed subdivision was not consistent with the district plan that had been approved by the city (but had not yet been formally adopted), and that the subdivision would result in excess grading, excess traffic, and environmental damage. The agency approved the tentative tract map.

The petitioners appealed from the action of the agency to the planning commission; and, while that appeal was pending (and prior to hearing thereof) the council formally adopted the district plan. At the hearing, petitioners made objections similar to the objections they had made before the agency,[4] and requested that the city prepare an environmental impact report; and, as previously stated, the commissioners allegedly voted "2 to 2" upon a motion to "deny" the appeal and sustain the action of the advisory agency. The transcript of that hearing shows that there was extended discussion among the four commissioners. Those discussions indicate that a commissioner (Gomez) was in favor of the subdivision; two commissioners (Moir, Armstrong) were strongly opposed to it; and another commissioner (Diller) was (in his words) "just torn apart" after hearing from "both sides," but he could not go along with the appeal because he would "strictly go along with the reports and recommendations from all our departments which make the city." Among other things, Commissioner Gomez (who was in favor of the subdivision) said: "As far as the environment is concerned anything would be an improvement over that bare hill." Commissioner Moir (who

---

[4]The transcript of the hearing before the planning commission shows that there are many "omissions" of parts of the proceedings, including the omission of the entire presentations by petitioners and of the real party in interest. The transcript includes a statement by a Councilman Braude wherein he said in part that he had represented the hillside areas for years; this tract of land had never been developed previously because it was worthless in that it was steep, hillside land and the owners did not think that it was worthwhile to develop it and build adequate roads; it is on a high ridge and the streets are not of sufficient width to serve 123 homes, especially as to access by fire, police, police and emergency vehicles, and rubbish trucks; traffic on the narrow streets would endanger children; and the appeal should be sustained and the developer told to turn in a tract with substantially fewer dwelling units.

was against the subdivision) said that it was "one of the poorest subdivisions I've seen since I've been on the commission" in that, among other things, they are planning to "take the top off the hill" and move "750,000 to 1,000,000 yards of soil," and "that is the very thing that this Environmental Impact has brought about, is those sort of activities." Commissioner Gomez made a motion to "deny" the appeal. The commissioners discussed what the situation would be if they could not reach a majority decision. A commissioner said that if they did not get a majority decision, the decision of the advisory agency is confirmed and that the matter would automatically "stay and carry up to date" and go before the council. The transcript concludes with the following statement of a commissioner: "I think the public should know that at this time the appeal has been denied in effect because we do not have any decisions; therefore the advisory agency decision stands and goes to the Council and the Council will have to deal with it there."

At the hearing on the appeal before the city council, statements were made by petitioners and Consolidated (real party in interest). A motion was made to "grant" the appeal. A councilman (who apparently was against the motion) said that he did not know what the issues were, he did not know anything about hillside conditions, the streets in his councilmanic district were not as wide as the streets at the subdivision and he did not think that anyone needed an acre to himself when thousands of people in his district were living five and six to an acre. Statements were made by councilmen regarding the effect of the proposed subdivision upon the contour of the hills and upon traffic, including the question whether the proposed subdivision was consistent with the district plan that all slopes in excess of 15 percent be designated for maximum density of 0.5 to 1 dwelling unit per acre. One councilman said that the proposed subdivision did not comply with the requirement of the plan that a maximum of 0.5 to 1 dwelling unit be permitted where the grade exceeds 15 percent; all of "this grade" exceeds 15 percent and some of it is as high as 40 percent; if the subdivision complied with the plan, the maximum dwelling units permitted would be 35 dwellings; 123 units "nowhere near complies with the plan"; and he seriously wondered what a court would say if the council approved the proposed 123 units. A motion was made to amend the motion to "grant" the appeal so that it would state that the density "greatly exceeds" the requirement of the district plan that all slopes in excess of 15 percent be designated for density of 0.5 to 1 dwelling unit per acre. The council vote on said amendment was eight to five in favor of it. Another councilman asked

the city attorney whether findings by the council were a legal requirement; and the city attorney replied in the affirmative. The city attorney also said that he had drafted findings at the request of the councilmen (councilmen who apparently were against approval of the subdivision), but that the findings and the determination as to whether the evidence supported the findings must be made by the councilmen. When a vote was taken upon the motion as amended to grant the appeal, the vote was seven to seven.

It thus appears that neither the planning commission nor the council made express findings of fact. Although the Legislature has expressly provided (Bus. & Prof. Code, §§ 11526, subd. (c), 11526.2, subd. (c), 11549.5) that the advisory agency, appeal board (planning commission), or governing body (city council) shall not approve a tentative subdivision map unless it first finds that the proposed subdivision is consistent with the applicable general and specific plans, there was no express finding by any of those agencies that the proposed subdivision herein was consistent with the district plan (which was a part of general plan). The advisory agency did make a *preliminary* determination prior to its formal hearing that the proposed subdivision was in accordance with the West San Fernando Valley Community Plan that was in existence at the time of the preliminary determination; and the council (without a hearing) adopted said *preliminary* determination. There was no finding, however, by the council, or commission, or agency, that the proposed subdivision was consistent with the district plan (Canoga Park-Winnetka-Woodland Hills District Plan) approved and adopted by the council while the administrative appeals were pending. There was evidence that the proposed subdivision was not consistent with said district plan in that the grading of the slopes exceeded 15 percent and the proposed dwelling units were 3.3 to an acre. The issue whether the proposed subdivision was consistent with the district plan in that respect was raised at the hearings before the commission and the council. As above stated, the council by an eight to five vote amended the motion to "grant" so that it would state that the density of the proposed subdivision "greatly exceeds" said requirement of the district plan.[5] The petitioners, in addition to raising the issue as to whether the proposed subdivision was consistent with the district plan, raised issues such as to whether the

---

[5]In its order, the trial court stated that the question concerning the general plan as it existed in July of 1972 and as it existed at the time of the appellate hearings was thoroughly presented to the appellate bodies.

proposed subdivision would cause excess traffic and whether an environmental impact report was required. Failure by the council (and planning commission) to make findings to support its ultimate decision resulted in inability of a reviewing court to bridge the analytic gap between the evidence and the ultimate decision of the council (and planning commission). (See *Topanga Assn. For A Scenic Community* v. *County of Los Angeles,* 11 Cal.3d 506, *supra.*) Here, upon proceedings in administrative mandamus, the trial court considered provisions of the Municipal Code and determined that each tie vote (by commission, by council) was a finding "by implication" that the proposed subdivision was consistent with applicable general or specific plans as required by section 11526.2 of the Business and Professions Code; that the tie vote in each case was an implied finding that the appeal was not meritorious; and that the decision of the lower body should stand.

An express finding that the proposed subdivision tract map was consistent with the district plan was required herein in order to support a decision approving the proposed map. A tie vote under the circumstances here, where such a finding of consistency was a legal prerequisite of approval, did not constitute approval action. As above indicated, the *Topanga Assn.* case, *supra,* above referred to, had not been decided when the trial court rendered its judgment in the present case. The trial court erred in determining that there was a finding by implication which was sufficient for approval of the proposed subdivision map.

After the appeal herein was submitted for decision, the Supreme Court rendered its decision in *No. Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68 [118 Cal.Rptr. 34, 529 P.2d 66], wherein the city had approved an oil-well drilling project without a written determination concerning the environmental impact of the project; and the judgment of the trial court was reversed because the city failed to proceed in the manner required by law.

In the present case the judgment should be reversed and the cause remanded to the superior court with the direction that the superior court remand the matter to the city council for proceedings in the manner required by law, particularly as required by section 11526, subdivision (c), of the Business and Professions Code, with respect to finding whether the proposed subdivision map is consistent with that part of the general plan adopted by the council as the Canoga Park-Winnetka-Woodland

Hills District Plan; and as required by the case of *Topanga Assn. For A Scenic Community* v. *County of Los Angeles,* 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12], with respect to making findings.

The judgment is reversed, and the cause is remanded to the superior court to proceed in accordance with the views herein expressed. The superior court may determine a motion, if any, by plaintiffs in the superior court for attorney's fees on appeal.

Lillie, J., and Hanson, J., concurred.

Petitions for a rehearing were denied February 20, 1975, and the opinion and judgment were modified to read as printed above.