Opinion
 

 ROUSE, J.
 

 In this action plaintiffs, City of Carmel-By-The-Sea (City), the Carmel Area Coalition, Inc. (Coalition), and Mary M. Arnn (Arnn), sought a writ of mandate directing defendants, the Monterey County Board of Supervisors (Board), and the Zoning Administrator for Monterey County (Zoning Administrator), to with
 
 *87
 
 draw a use permit that had been issued to the real party in interest, Carmel Properties Company, for a proposed motel development; also, an injunction prohibiting the chief building inspector from issuing a building permit on the project. The trial court upheld the issuance of the use permit and entered judgment for defendants. Plaintiffs have appealed from that judgment. We have reviewed the administrative findings and conclude that they are not sufficient to support the decision and action of the agencies involved.
 
 (Topanga Assn. for a Scenic Community
 
 v.
 
 County of Los Angeles
 
 (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12].) Accordingly, we reverse the judgment.
 

 On September 24, 1973, Carmel Properties Company filed, with the Zoning Administrator, an application for a use permit to build a motel. This application was subsequently modified on June 4, 1974, to add a restaurant to the proposed complex and decrease the number of proposed rooms to 128. The property which is the subject of this application is a 3.8-acre parcel of land lying on the north side of Rio Road between State Highway 1 and Carmel Rancho Boulevard, in the mouth of the Carmel Valley. The site is about 1.5 miles from downtown Carmel and about 5 miles from downtown Monterey. At the time of the application for a use permit, the property was zoned R-3-D-B-4, which indicates use for a limited multi-family dwelling (R-3), with design control requirements (D) and a one-acre minimum building site (B-4). The “R-3” designation also indicates use for a resort hotel or motel on application for, and granting of, a use permit. The eastern side of the property is currently occupied by a 16-unit apartment development in which 44 people live. The westerly two-thirds of the property is vacant, and has been undeveloped for nearly two decades. The apartments were built in 1953-1954, and are an existing nonconforming use. They are in need of major repairs and could be considered substandard when viewed in the light of present building code requirements.
 

 The project falls within the Carmel Valley Master Plan, a part of the Monterey County Master Plan. The parcel for which the use permit is sought was designated for commercial development under the plan. This designation was further refined to transient-residential use in 1963, when the “R-3” designation was adopted.
 

 An environmental impact report (EIR) was prepared on the project and submitted to various agencies, departments and interested parties, including the City and the Coalition, before it was finally
 
 *88
 
 adopted at a public hearing before the Board on August 27, 1974. The adverse environmental impacts of the proposed project were set forth as follows: (1) Water—the project would result in a net increase in water consumption of about 23-24 acre feet per year, which is not significant by itself, but when this project is considered with nine other developments currently planned or already approved for the area, the cumulative impact of these 10 projects would be a 1
 
 Vi
 
 percent increase in the current water demand; (2) Sanitation—the approval of the project would result in a 1 percent increase in the current load on the Carmel Sanitary District facilities, presently operating at 73 percent of design capacity, and a 3 percent decrease in its reserve capacity; (3) Traffic—the approval of the project would result in an increase of 560-640 car movements a day on Highway 1, which is not significant by itself, but given the already critical volumes of traffic on Highway 1, the additional volume generated by this and other projects will aggravate the existing situation; (4)
 
 Air
 
 Quality—the approval of this project will not present an immediate threat to the air quality in the Carmel Valley, but when added to other projects that are proposed, or already approved, there is the potential for an increase in air pollution of 18-25 percent, which is “a very serious and real threat and should be considered by decision-makers, as they approve each major project”; (5) Population—the approval of this project will result in the displacement of 16 families (44 people) in an area where housing is extremely difficult to obtain for families with children.
 

 The EIR summary characterizes three of these adverse impacts as significant: utilities, i.e., water and sewáge; traffic; and population. The EIR summary also outlines the mitigating measures that have been proposed by Carmel Properties Company to minimize the adverse effects of the project, as follows: providing extensive landscaping; building a four-lane road; building a flood control dike; installing pre-sized sewer and utility facilities; and contributing toward the installation of signals at the intersection of Highway 1 and Rio Road.
 

 The EIR mentions several alternatives to the proposed development, including: (1) no project, which would eliminate all adverse impacts; (2) residential development, which would probably have a greater adverse impact than the proposed motel; (3) development as a park, which would have less of an adverse impact but would also have fewer economic advantages; and (4) development of a smaller motel, which
 
 *89
 
 would have less adverse environmental impact, but which Carmel Properties Company rejects as being economically unfeasible.
 

 After the EIR was certified by the Board, it was forwarded to the Zoning Administrator for consideration relative to the granting of the permit. The Zoning Administrator conducted a public hearing on this matter on September 26, 1974, at which the City and Carmel Properties Company were represented. After hearing comments on the application, the Zoning Administrator granted the use permit to build the proposed motel, subject to 12
 
 [1]
 
 A written memorandum of his decision was mailed to Carmel Properties Company on September 30, 1974. This decision makes written findings of fact,
 
 [2]
 
 which are a verbatim quotation from section 32c of Monterey County Zoning Ordinance 911. It also sets out the 12 conditions upon which the issuance of the use permit is based. In addition, written minutes summarizing the proceedings were prepared after the hearing. The oral remarks of the Zoning Administrator in introducing this proposal for consideration, and later in summarizing his findings and rendering his decision, were recorded at the hearing. These
 
 *90
 
 oral remarks were not reduced to a written transcript until after this suit was brought.
 

 The City appealed the decision of the Zoning Administrator to the Board. A hearing was held before the Board on November 12, 1974. After hearing discussion of the matter for three and one-half hours, the Board denied the appeal without making any findings. None of the comments made at the hearing on appeal, other than the introductory comments of the Zoning Administrator, were made a part of the record herein.
 

 Plaintiffs then brought this suit on March 21, 1975, seeking a writ of mandate to withdraw the use permit and an injunction to prevent the issuance of a building permit. Sitting without a jury, the trial court made certain conclusions of law which .are significant on appeal, namely, that the Zoning Administrator’s findings in this case, although not made in writing, were sufficiently ascertainable so as to bridge the analytic gap between the raw evidence and his (the Zoning Administrator’s) ultimate decision; that such findings included a transcription of the public hearing which was recorded and the Zoning Administrator’s declaration setting forth his oral remarks made at the close of the hearing; that the Zoning Administrator did consider alternatives set forth in an EIR, including the developer’s statement, and made an implied finding that a smaller project was not economically feasible; that the Zoning Administrator also considered the existence of water mains servicing the property and impliedly found that there was no adverse effect from the proposed water use except such as might be cumulative; that the Zoning Administrator, in his discretion, could properly grant the use permit since, in his opinion, the environmental problems described in the EIR were not of significant proportion so as to justify a denial of the use permit, but rather were cumulative in nature; that the Zoning Administrator’s findings disclosed that he had exercised his discretion and considered environmental matters, as required by law, and that such findings were supported by substantial evidence. On the basis of its findings, the trial court determined that the request to cancel the use permit in question should be denied and the alternative writ of mandate discharged. The trial court entered judgment in favor of the defendants and upheld the issuance of the use permit.
 
 [3]
 
 Plaintiffs appealed.
 

 
 *91
 
 Plaintiff’s appeal raises several issues: (1) whether the form of the Zoning Administrator’s findings complies with the requirements of
 
 Topanga Assn. for a Scenic Community
 
 v.
 
 County of Los Angeles,
 
 supra; (2) whether the Zoning Administrator was required to discuss and make findings regarding the adverse effects, cumulative impacts, and alternatives presented in the EIR before rendering a decision; (3) whether, in light of
 
 Topanga,
 
 it is proper for a reviewing court to make implied findings on these matters, when the Zoning Administrator made no express findings; (4) whether there is substantial evidence to support the decision of the Zoning Administrator and the trial court; (5) whether the Zoning Administrator failed to exercise the discretion conferred upon him by statute; and (6) whether the Board was required to make written findings on appeal from the granting of the use permit.
 

 At the outset, it must be noted that the substantial evidence test is the proper standard of review for a trial court in examining the decision of a local administrative agency when no fundamental vested right is involved. (Code Civ. Proc., § 1094.5;
 
 Topanga Assn. for a Scenic Community
 
 v.
 
 County of Los Angeles, supra,
 
 at p. 510.) This court must apply the same substantial evidence test when reviewing the decision of the administrative agency and the trial court.
 
 (Carmel Valley View, Ltd.
 
 v.
 
 Board of Supervisors
 
 (1976) 58 Cal.App.3d 817, 820 [130 Cal.Rptr. 249].)
 

 There is no merit in plaintiffs’ contention that only written findings of fact, labeled as such, are sufficient to comply with the requirements of
 
 Topanga.
 
 While
 
 Topanga
 
 seeks to avoid requiring a reviewing court to conduct a search through the record for some combination of evidence which supports the decision of the agency, it does not preclude a reviewing court from looking to the record to determine the findings upon which the decision is based. A reviewing court must scrutinize the record and determine whether substantial evidence supports the administrative agency’s findings and whether these findings support the agency’s decision. In making these determinations, the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision.
 
 (Topanga, supra,
 
 at p. 514.) Therefore, this court may look to the whole record to see if (1) the evidence supports the findings, and (2) the findings support the decision. (In
 
 *92
 

 Topanga Assn. for a Scenic Community
 
 v.
 
 County of Los Angeles, supra,
 
 at pp. 518-522, the Supreme Court looked to a commission’s summary of “factual data” to locate its “findings”; in
 
 McMillan
 
 v.
 
 American Gen. Fin. Corp.
 
 (1976) 60 Cal.App.3d 175, 183-185 [131 Cal.Rptr. 462], this court held that a city council need not make express findings of its own in reaching a decision, but may incorporate by reference a staff report as its implied findings on the matter.)
 

 Plaintiffs also argue that the trial court erred in looking for findings in the oral remarks made by the Zoning Administrator in rendering his decision. This argument is not persuasive. The oral remarks here involved were made at a public hearing at which the City was present, were taped and could be reduced to a written transcript. (Cf.
 
 Woodland Hills Residents Assn., Inc.
 
 v.
 
 City Council
 
 (1975) 44 Cal.App.3d 825, 835-838 [118 Cal.Rptr. 856], the reviewing court reviewed and examined transcripts of hearings before both the planning commission and the city council before deciding that these agencies had not made findings as required by
 
 Topanga.)
 

 Plaintiffs are correct, however, in their assertion that the written findings of fact in the Zoning Administrator’s decision are insufficient as a matter of law because they are merely a recitation of statutory language.
 
 (Topanga Assn. for a Scenic Community
 
 v.
 
 County of Los Angeles, supra,
 
 at p. 517, fn. 16.)
 

 In reviewing the entire record, the trial court found on substantial evidence that the findings of the Zoning Administrator were set out in his written decision; the written minutes of the September 26th hearing; the transcribed remarks made at the end of the September 26th hearing; and the written report prepared in response to the appeal to the Board. The Zoning Administrator’s findings are that: (1) the density of the proposed project is less than the maximum allowed for this property; (2) the property is zoned for transient-residential use, such as the proposed motel; (3) the county roads in the area are designed to handle the traffic in the area; (4) Highway 1 is not designed to handle the traffic it is presently handling; (5) the property in question is designed, planned and anticipated both by the owners and by the county for the proposed use; (6) the question is whether the property should be developed at this time; (7) the EIR mentions both the traffic situation and the air quality situation; (8) there has been no correspondence from the air pollution control officer indicating that approval of this project would be particularly detrimental to air quality; (9) the concerns about
 
 *93
 
 air pollution, water and traffic are legislative matters; (10) attempts to effect a stop of uses should be directed at the Board, because there are many uses that affect these environmental concerns which do not require use permits from the Zoning Administrator; (11) a property owner has a right to develop property as he was assured that he could;
 
 [4]
 
 (12) even if a use permit is granted, Carmel Properties Company must comply with the ordinances and regulations of various county building and health agencies; (13) the qualifications of section 32c of Monterey County Zoning Ordinance 911 do not apply to the subject property; (14) the zoning history supports granting the permit; (15) the granting of a use permit is reasonable in this case; (16) the use permit will be granted subject to 12 conditions; (17) these conditions will ensure further review as to design, parking, access, etc.
 

 Plaintiffs attack these findings on a number of grounds. They argue that the findings are deficient because they do not discuss the points raised in the EIR regarding the adverse environmental effects of the project, the cumulative environmental impact of the project, and the proposed alternatives mentioned in the final EIR. They argue that it was improper for the trial court to make implied findings on these environmental matters in light of
 
 Topanga, supra,
 
 when the Zoning Administrator has made no express findings. They also contend that the findings that were made are not supported by substantial evidence.
 

 The duty to evaluate the environmental impact of a project and to consider less harmful alternatives is codified in the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.) and the regulations promulgated to implement it (State EIR Guidelines, Cal. Admin. Code, tit. 14, § 15000 et seq. (Guidelines).) These Guidelines establish a detailed procedure for evaluating the environmental consequences of a proposed project. A draft EIR must be prepared for any project which has a significant effect upon the environment. (Guidelines, § 15084, subd. (a).) After the draft EIR has been completed, it must be distributed to interested parties and the public for their.comments (Guidelines, § 15085, subd. (d)). The agency
 
 *94
 
 responsible for preparing the EIR must evaluate these comments and then prepare and certify the final EIR (Guidelines, § 15085. subds. (e), (f)). The final EIR must contain the draft EIR, the comments received on the draft, and the agency’s response to “significant environmental points raised in the review and consultation process” (Guidelines, § 15146, subd. (a)). The Guidelines provide that these responses “shall describe the disposition of significant environmental issues raised (e.g., revisions to the proposed project to mitigate anticipated impacts or objections). In particular
 
 the major issues raised when the
 
 ...
 
 [a]gency’s position is at variance with recommendations and objections raised in the comments must be addressed in detail giving reasons why specific comments and suggestions were not accepted, and factors of overriding importance warranting an override of the
 
 suggestions.” (Guidelines, § 15146, subd. (b); italics added.)
 

 After the final EIR has been,prepared and certified, the responsible decision-making body must decide whether or not to approve the project after reviewing and .considering the information contained in the final EIR (Guidelines, § 15085, subd. (g)). If the decision-making body approves a project that has adverse environmental consequences, it “must state in writing reasons to support its action based on the final EIR or other information in the record.” (Former Guidelines (Oct. 9, 1976) § 15088, subd. (b).)
 
 [5]
 
 After this decision to go ahead with the project is made, the decision-making body must file a “notice of determination” with the county clerk. (Pub. Resources Code, § 21152, subd. (a).) While an EIR does not require a public agency to act in any particular manner, it constitutes evidence which must be considered by the public agency along with other evidence which may be presented to the agency.
 
 (Carmel Valley View, Ltd.
 
 v.
 
 Board of Supervisors, supra,
 
 at p. 822.)
 

 
 *95
 
 In this case, it appears that the role of the Zoning Administrator in the decision-making process may well be the core of this whole dispute. Plaintiffs view his job as involving the prime decision-making authority on environmental matters. They contend that he has an obligation to consider and weigh all issues raised in the EIR before making his decision regarding the issuance of use permits. The Zoning Administrator, on the other hand, viewed his job as one which is limited to the interpretation and application of the zoning laws; apparently, he believed that the environmental effects of development projects were more properly the concern of the zoning authority, viz., the board of supervisors.
 

 We believe that the plaintiffs’ theory is more compatible with the intent of the statutes. The Zoning Administrator is a position created by the legislative body of the county. (Gov. Code, § 65900.) He is charged with hearing and deciding applications for conditional uses and other permits in accordance with criteria established by zoning ordinances. (Gov. Code, § 65901.) The criteria for use permits in Monterey County are set out in section 32c of Monterey County Zoning Ordinance 911. In addition to his responsibilities under the zoning laws, the Zoning Administrator in Monterey County is also the “administrative official having final approval authority over the project” for the purposes of the CEQA, as that term is used in the Guidelines, section 15085, subdivision (g). According to the Guidelines, he has the duty to review and consider the EIR, and if his decision “allows the occurrence of substantial adverse environmental consequences . . . [he] must state in writing reasons to support [his] action based on the final EIR or other information in the record.” (Former Guidelines (Oct. 9, 1976) § 15088, subd. (b); Guidelines, § 15085, subd. (g).)
 
 [6]
 

 In light of specific statutory requirements described herein, we find that the Zoning Administrator’s decision to issue the use permit is deficient under the CEQA.
 
 [7]
 
 The CEQA requires the decision maker “to
 
 *96
 
 consider qualitative factors as well as economic and technical factors and long-term benefits and costs, in addition to short-term benefits and costs and to consider alternatives to proposed actions affecting the environment.” (Pub. Resources Code, § 21001, subd. (g).) We cannot agree with the trial court’s determination that the Zoning Administrator gave the EIR a significant role in considering the use permit application. To the contrary, the Zoning Administrator’s statement that “if the concern is one of air pollution, or water, traffic, then I personally feel this is a legislative decision” indicates that he abdicated the responsibility to make decisions on environmental matters which had been vested in him by the board and the CEQA. CEQA requires the decisionmaker to balance the benefits of a proposed project against its unavoidable environmental risks in determining whether to approve the project.
 
 (San Francisco Ecology Center
 
 v.
 
 City and County of San Francisco
 
 (1975) 48 Cal.App.3d 584, 589 [122 Cal.Rptr. 100].) Neither in the Zoning Administrator’s findings nor in any of the matters considered in support thereof do we find evidence of, or a discussion concerning, economic or social values in the project which override the adverse effects disclosed by the EIR.
 
 (Burger
 
 v.
 
 County of Mendocino
 
 (1975) 45 Cal.App.3d 322, 326 [119 Cal.Rptr. 568].) In fact, despite the valiant efforts of a learned trial judge to uphold the Zoning Administrator’s decision, we are unable to find anything in the administrative record from which the evaluation and resolution of such environmental problems can even be
 
 implied.
 
 The absence of such an evaluation makes compliance with section 21001, subdivision (g), of the Public Resources Code impossible as a matter of law. We must conclude, therefore, that the Zoning Administrator’s findings are insufficient to support his decision.
 

 In view of the foregoing, we deem it unnecessary to discuss plaintiffs’ remaining contentions.
 

 The judgment is reversed and the cause remanded for such further proceedings as are consistent with this opinion, including, if deemed desirable, return to the Board for further consideration.
 

 Taylor, P. J., and Kane, J., concurred.
 

 [1]
 

 The 12 conditions are:
 

 1. The permit allows a 128-unit motel on 3.8 acres, with a restaurant.
 

 2. That the developer participate in the cost of signalization at the intersection of Rio Road and Highway 1 by paying one-eighth of the total cost.
 

 3. Provide drainage improvement study on-site and off-site. Study to be approved by the county surveyor.
 

 4. Provide off-street parking. Layout to be approved by the director of planning.
 

 5. Annex to County Service Area No. 23 (if required).
 

 6. That the applicant install an entrance light at the driveway connection to Rio Road and pay for the energy cost until such time that the service area can afford to pick up this service. Type and location of lighting to be approved by the county surveyor.
 

 7. That the location of all buildings and uses be approved by the director of planning.
 

 8. That the site be landscaped by the applicant and that the landscaping plan be approved by the director of planning.
 

 9. That all landscaped areas shall be continuously maintained by the applicant in a litter-free, weed-free condition and all plant material shall be continuously maintained in a healthy, growing condition.
 

 10. That the location, type and wattage of all exterior lights on the property be approved by the director of planning.
 

 11. The design of all structures, buildings and signs be approved by the planning commission.
 

 12. That the permit expire on September 26. 1976, unless construction is started prior thereto.
 

 [2]
 

 The written findings of fact made by the Zoning Administrator are as follows: “That the establishment, maintenance, or operation of the use or building applied for will not under the circumstances of the particular case, be detrimental to health, safety, peace, morals, comfort, and general welfare of persons residing or working in the neighborhood of such proposed use or be detrimental or injurious .to property and improvements in the neighborhood or to the general welfare of the County.”
 

 [3]
 

 In entering its judgment against plaintiffs, the trial court nonetheless ordered the Zoning Administrator to make findings that comply with
 
 Topanga Assn. for a Scenic Community
 
 v.
 
 County of Los Angeles (1974) 11
 
 Cal.3d
 
 506 [113
 
 Cal.Rptr. 836, 522 P.2d
 
 *91
 
 12], and
 
 Burger
 
 v.
 
 County of Mendocino
 
 (1975) 45 Cal.App.3d 322 [119 Cal.Rptr. 568]. By so ordering, the trial court implicitly indicates that the findings made in this case were less than adequate.
 

 [4]
 

 Plaintiffs correctly point out that landowners have no vested right to develop property under existing zoning laws (HFH,
 
 Ltd.
 
 v.
 
 Superior Court
 
 (1975) 15 Cal.3d 508. 516 [125 Cal.Rptr. 365, 542 P.2d 237]) absent a showing of detrimental change in position-caused by reliance upon
 
 prior
 
 governmental approval.
 
 (Anderson
 
 v.
 
 City Council
 
 (1964) 229 Cal.App.2d 79. 88-89 [40 Cal.Rptr. 41].) No such detrimental reliance is alleged in this case. However, this misconception of the law is not material because it is not necessary to support the Zoning Administrator’s decision.
 

 [5]
 

 The duty of the decision-making body to make findings on significant effects listed in the EIR was codified by the Legislature when it made a major revision of the Public Resources Code in September 1976, including the addition of section 21081, which provides that: “Pursuant to the policy stated in Sections 21002 and 21002.1, no public agency shall approve or carry out a project for which an environmental impact report has been completed which identifies one or more significant effects thereof unless such public agency makes one, or .more, of the following findings: [¶ (a) Changes or alterations have been required in, or incorporated into, such project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental impact report. [¶ (b) Such changes or alterations are within the responsibility and jurisdiction of another public agency and such changes have been adopted by such other agency, or can and should be adopted by such other agency. [¶ (c) Specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report.” These provisions have been incorporated into the Guidelines as section 15088.
 

 [6]
 

 Note that section 15088 of the Guidelines has been amended and now requires more specific findings (see fn. 5.
 
 ante).
 

 [7]
 

 Since this matter must be remanded, it is appropriate to point out that, although not challenged on appeal, it appears that the final EIR is defective under CEQA Guidelines because the staff responses to comments received on the draft EIR do not adequately describe the disposition of significant environmental issues raised and do not give reasons and factors of overriding importance that justify rejecting the suggestions made, as required by Guidelines, section 15146, subdivision (b). (Cf.
 
 People
 
 v.
 
 County of Kern
 
 (1974) 39 Cal.App.3d 830. 841 [115 Cal.Rptr. 67], failure to respond with specificity to comments and objections raised about the draft EIR renders the final EIR fatally defective.)