[Civ. No. 62041. Second Dist., Div. Five. Apr. 20, 1982.]

OSCAR KRATER et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

COUNSEL

Burt Pines and Ira Reiner, City Attorneys, Claude Hilker, Gary R. Netzer, William B. Burge, Claudia McGee Henry, Assistant City Attorneys, and Ann H. Higginbotham, Deputy City Attorney, for Defendants and Appellants.

Drummy, Garrett, King & Harrison, Alan I. White and Philip W. Green for Plaintiffs and Respondents.

OPINION

**STEPHENS, Acting P. J.**—Appellants, City of Los Angeles (City) and Los Angeles City Council (Council), appeal from a judgment granting respondents', Oscar and Miriam Krater's (Krater), petition for a writ of mandate to set aside the Council's decision to deny Krater's application to convert a 32-unit apartment complex to a 35-unit condominium.

The Fulton Apartments, owned by respondents Krater, is a 32-unit building located at 4419 Fulton Avenue, Los Angeles, California. In June of 1979, Krater submitted to the City's advisory agency a tentative map (assigned No. 37795) for approval of the proposed conversion and also the construction of 3 additional units, totaling 35 condominium units.[1]

At the time of this application, condominium conversions were regulated by city ordinance No. 151,432 (Ordinance), effective October 1, 1978, and superseded by No. 153,024, effective November 10, 1979. Section 12.5.2.F.6 of the Ordinance (subsection six) provided: "The Advisory Agency may disapprove a Tentative Map or Preliminary Parcel Map for a condominium conversion project if it finds that at any time during the 18 months prior to Map application more than 50% of the dwelling units in the project were occupied by a person over the age of 62, a handicapped or disabled person as herein defined, and/or one or more minor dependent children, and the applicant has not developed a reasonable relocation assistance plan with respect to each such person. [¶] Any such relocation assistance plan shall contain, at a minimum: [¶]

[1]The Subdivision Map Act (Gov. Code, § 66410 et seq.) vests authority in local agencies to regulate and control the design and improvement of subdivisions, requiring a tentative and final map (*id.*, § 66411). Such a map is required for all subdivisions creating five or more condominiums (*id.*, § 66426).

(a) A report to each tenant concerning the availability of housing in the area of the project comparable to the unit occupied by the tenant as to quality, price and amenities; and [¶] (b) A description of the reasonable steps the applicant will undertake to assure successful relocation of each tenant; and [¶] (c) An unconditional offer to pay each relocated tenant a relocation fee not to exceed $500. [¶] The Advisory Agency may disapprove any relocation assistance plan which does not satisfy the criteria herein."[2]

Following public hearings, the advisory agency approved the tentative map on November 9, 1979, based on certain findings of fact and subject to certain conditions. One of its findings was that during the 18-month period prior to Krater's application, *not* more than 50 percent of the units were occupied by tenants who were over the age of 62, handicapped or disabled, or minor dependent children (collectively special tenants), and that Krater had submitted a tenant relocation assistance plan whereby Krater nonetheless agreed not to require any special tenant to move until comparable relocation housing was found for him. Additionally, the plan, enforceable by any tenant or the City, set forth factors to be considered by the advisory agency in determining the comparability of replacement rental units[3] among other conditions.[4]

A tenant of the Fulton Apartments, William E. Bassett, appealed the advisory agency's decision to the city planning commission. After two public hearings the planning commission, in denying the appeal, concluded on January 24, 1980: "As approved by the Advisory Agency, the

---

[2]A review of the administrative record indicates that the Council's finding, also adopted by the trial court, of more than 50 percent special tenant residents was reasonably made, thus making subsection six of the ordinance operative.

[3]These factors are: adequacy of unit, including number of bedrooms and bathrooms; price; location; proximity to medical and recreational facilities, parks, community centers, shops, transportation, schools, churches and synagogues; and amenities. A unit is not comparable if it is located in a building for which an application for conversion has been filed with a governmental agency.

[4]The relocation assistance plan agreement binds Krater to: provide a relocation staff to furnish tenants with current information on the location and availability of comparable rental units in the area, transportation to inspect comparable rental housing and other personal services related to each tenant; permit every tenant to remain in his unit until November 1, 1980, and permit special tenants to remain until suitable comparable housing is found for them; subsidize for a period of one year any increased rent incurred by a relocated special tenant, and pay up to $100 per month rental subsidy to any other vacated tenant; pay actual moving costs of each tenant; unconditionally pay a $750 relocation fee to each tenant; and to conform to the agency's resolution of plan interpretation disputes.

tentative map conforms with the purposes, intent and provisions of the Subdivision Map Act and Section 12.5.2 of the Los Angeles Municipal Code. The required findings were made and are contained in the report dated November 9, 1979." Thus, it appears that the planning commission adopted the findings of the advisory agency that less than 50 percent of the rental units were occupied by special tenants. The commission also modified some conditions of approval of the tentative map by: extending the earliest date for tenant removal to March 1, 1981; placing a moratorium on rent increases prior to relocation; and requiring Krater to deed to the City an existing eight-unit building adjacent to the project and to pay up to $15,000 to move the building to a site selected by the City.

Tenant Bassett appealed the commission's decision to the city Council. On March 10, 1980, after public hearing and pursuant to the recommendation of its planning and environment committee (Committee), the Council upheld the appeal and rejected Krater's tentative map application. The Council found that: *more* than 50 percent of the residents in the apartment building are or were over the age of 62, handicapped, disabled or residing with one or more dependent children; a reasonable relocation plan is required; and the proposed relocation plan is not reasonable, "because its implementation is prevented by the lack of available comparable rental units in the City of Los Angeles." This was the only finding made by the Council.

Krater petitioned the superior court for a writ of mandate (Code Civ. Proc., § 1094.5) to compel the City and the Council to approve Krater's tentative map subject to the conditions imposed by the advisory agency, as modified by the Committee. A peremptory writ was granted on the ground that "The council's finding of unreasonableness was based only on evidence of lack of available comparable housing. The plan, however, must be said to be reasonable since the protected tenants will not be required to move at all unless comparable housing is found for them by plaintiff [Krater]." The City and Council now appeal this judgment.

## SCOPE OF APPELLATE REVIEW

The administrative mandamus statute, Code of Civil Procedure section 1094.5, states in subdivision (b) that an abuse of discretion is established whenever the administrative agency has not proceeded in the manner prescribed by law, when its order or decision is not supported by findings, or when the findings are not supported by the evidence.

Subdivision (c) further provides two tests for review of the evidence: the independent judgment standard and the substantial evidence standard. ■ Unless a fundamental vested right is involved, the substantial evidence test is to be applied by both the trial court and the appellate court. (*City of Walnut Creek* v. *County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1016 [162 Cal.Rptr. 224]; *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1977) 71 Cal.App.3d 84, 91 [139 Cal. Rptr. 214].) Cases involving land use regulation do not affect fundamental vested rights. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 510 [113 Cal.Rptr. 836, 522 P.2d 12]; *City of Walnut Creek* v. *County of Contra Costa, supra*, at p. 1016.)

Accordingly, the issues before this court are whether there exists substantial evidence to support the Council's finding and whether that finding supports its decision. (*City of Carmel-by-the-Sea* v. *Board of Supervisors, supra*, at p. 91; *McMillan* v. *American Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175, 181-182 [131 Cal.Rptr. 462].) ■ In making these determinations, our inquiry, as was the trial court's, is limited to the record made before the Council. (*Id.*, at p. 182.)

### ANALYSIS

■ There is substantial evidence to support that portion of the Council's finding which states that there exists a "lack of comparable housing" in the area of the proposed conversion.[5] However, no evidence supports the finding insofar as it concludes that the low vacancy factor makes Krater's relocation assistance plan "unreasonable." Pursuant to subsection six, a condominium conversion applicant must provide a reasonable relocation assistance plan for special tenants. The relocation plan offered by Krater, as approved by both the advisory agency and the commission, permits all special tenants to remain in their units until comparable housing is secured for them. Under this plan, special tenants may stay indefinitely if Krater cannot relocate them in units acceptable to the advisory agency. (See fn. 4.) A lack of comparable rental units, therefore, causes special tenants no harm and is not a controlling factor as to the legitimate concerns of those tenants.

Appellants contend that the Ordinance authorizes consideration of the vacancy factor in determining relocation plan reasonableness be-

---

[5]The record contains a rental survey which disclosed a .82 percent (52 of 6,313) vacancy rate within a 15-square mile area.

cause the Ordinance requires the owner to provide information to tenants regarding comparable availability. We do not agree. ■ An intention to legislate by implication is not to be presumed. (*First Methodist Episcopal Church* v. *County of Los Angeles* (1928) 204 Cal. 201, 204 [267 P. 703].) "Courts should not read into statutes qualifications or modifications that will materially affect their operation so as to conform to a supposed intention not expressed by the Legislature. [Citations.]" (*Taylor* v. *McKay* (1975) 53 Cal.App.3d 644, 651-652 [126 Cal.Rptr. 204].) ■ The Ordinance merely requires that a report regarding comparable housing availability be included in the relocation plan. It does *not* state that a low vacancy factor can furnish the basis for finding the plan unreasonable where provision is made for the tenants pending availability of housing, regardless of the time it may take to obtain such housing. Clearly, such a provision cannot be read into the Ordinance.

That the Ordinance does not permit denial on the basis of vacancy rate under such circumstances is also clear by virtue of condominium Ordinance No. 153,024, subsequently enacted to supersede Ordinance No. 151,432. Section 4.F.6 of the new Ordinance *allows* denial of a tentative map if the conversion would have a significant cumulative effect on housing and "the vacancy rate of the planning area in which the property is located is five percent or less ...."[6] ■ It is presumed that a legislative body intended to change a law in all those particulars concerning which it made a change in language. (*Eu* v. *Chacon* (1976) 16 Cal.3d 465, 470 [128 Cal.Rptr. 1, 546 P.2d 289]; *Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 232 [273 P.2d 5]; *Van Nuis* v. *Los Angeles Soap Co.* (1973) 36 Cal.App.3d 222, 228 [111 Cal.Rptr. 398].) ■ The addition of language respecting vacancy rates in the subsequent Ordinance, when such language was not present in the former Ordinance, indicates that vacancy factor was not intended to be controlling under the former Ordinance.

Therefore, under the applicable Ordinance (No. 151,432) the vacancy rate is, at best, merely a consideration factor in determining the reasonableness of a relocation assistance plan. Accordingly, there is no support for the Council's finding that the plan was unreasonable because of the low vacancy rate in the area, nor does such a finding support the

---

[6]Krater's application was approved on November 9, 1979. The fact that Ordinance No. 153,024 (eff. Nov. 10, 1979) is inapplicable to the Krater application is uncontested.

Council's decision to deny Krater's tentative map application. It follows that the Council abused its discretion in denying the application. (Code Civ. Proc., § 1094.5, subd. (b).)

The judgment granting Krater's petition for peremptory writ is affirmed. The Council must set aside its decision of March 10, 1980, and thereafter proceed on the basis that there is no substantial evidence to support its finding of an unreasonable relocation plan.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied May 13, 1982.