[Civ. No. 19234. Second Dist., Div. Three. Mar. 24, 1953.]

EVERETT M. MORRIS et al., Respondents, v. CITY OF
LOS ANGELES, Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones and Alan
G. Campbell, Assistant City Attorneys, for Appellant.

Eugene L. Wolver for Respondents.

SHINN, P. J.—Prior to March, 1950, Sam Stephanian
owned a lot at the corner of Pennsylvania Avenue and Fickett
Street in the city of Los Angeles. The lot has a frontage
of 45 feet on Pennsylvania Avenue and depth of 120.9 feet
on Fickett Street. There are two houses and a double garage
on the lot; one house faces Fickett and the other faces Penn-
sylvania. The area is zoned R4 (multiple dwelling zone) and
the Los Angeles Comprehensive Zoning Plan, adopted as a
part of the municipal code by ordinance No. 90,500, by an
amendment adopted in 1950, provides that in an R4 zone
"every lot shall have a minimum width of fifty (50) and a
minimum area of five thousand (5,000) square feet." (Mun.

Code, § 12.11-C, 4.) Although Stephanian's lot was nonconforming as to minimum area it did not violate the ordinance. This, because the lot was so constituted at the time the ordinance was adopted and the ordinance by its terms did not apply to such lots. However, the zoning ordinance further provides: "No lot or parcel of land held under separate ownership at the time this Article became effective shall be separated in ownership or reduced in size below the minimum lot width or lot area required by this Article. . . ." (12.21-C, 1(k), Ordinance No. 92,066 adopted August 19, 1947.) In March, 1950, Stephanian sold the entire lot to plaintiffs and they, in turn, sold the northerly 40 feet (40 x 45) and the house fronting on Fickett Street to other persons. The remaining portion of the lot (45 x 80) with the other house was retained by plaintiffs. Section 11.00(m) of the Los Angeles Municipal Code declares that it shall be unlawful for any person to violate any provision or to fail to comply with any of the requirements of the code and provides punishment by fine or imprisonment for such offenses. After the sale by plaintiffs a criminal prosecution was commenced in the Los Angeles Municipal Court by the People against Mr. and Mrs. Morris complaining that by the division and sale of their lot they had committed misdemeanors, not only in selling the 40 x 45-foot part, but also in maintaining the 45 x 80 that remained. That proceeding is still pending.

Plaintiffs brought this action seeking to enjoin prosecution of the municipal court action and for a declaratory judgment that sections 12.11-C, 4 and 12.21-C, 1(j) and (k) are invalid for various reasons and for an injunction against criminal prosecution or other interference with the use of their property. The trial court found that both residences have been on the subject property for more than 25 years as have the majority of the buildings in the neighboring area and that practically all of the corner lots in the area have more than one dwelling unit thereon. The court further found that each of the dwelling units had separate utility connections and that: "Corner lots having thereon two or more separate and unconnected dwelling units, when such lots are divided and sold, together with a residence, to separate owners who occupy the same, are better kept, maintained or occupied by a better type of occupant and have fewer occupants than those which are tenant occupied, and neither public health or sanitary regulations are adversely

affected where such corner lots are sold and the residences thereon are occupied by separate owners." From the findings the court concluded that: "Sections 12.11-C, 4, 12.21-C, 1(j) and 12.21-C, 1(k) of the Los Angeles Municipal Code, as applied under the evidence in this case to the subject property, are invalid, arbitrary, discriminatory and unconstitutional and are not a reasonable use of the police power vested in the City of Los Angeles, and the enforcement of the said sections, as against the subject property, would in no way tend to accomplish the purposes for which the Comprehensive Zoning Plan and the other provisions of the Los Angeles Municipal Code were intended." The court further concluded that the sale of the northerly 40 feet of the property was legal, proper and valid and that insofar as the above mentioned sections of the Los Angeles Municipal Code purport to forbid the sale of the remaining 80 feet of the property, such sections are void. On the basis of its conclusions the court adjudged sections 12.11-C, 4, 12.21-C, 1(j) and 12.21-C, 1(k) to be unconstitutional as to plaintiffs and permanently enjoined the city of Los Angeles from prosecuting or bringing any civil or criminal action based on said sections against either of the plaintiffs by reason of the accomplished sale of the northerly 40 feet or by reason of the maintenance or future sale of the southerly 80 feet. (§ 12.21-C, 1(j) would apply only as § 12.21-C, 1(k) applies to the present case.) From this judgment the defendant city appeals.

It is defendant's contention that all the issues of this case were settled adversely to plaintiff by *Clemons* v. *City of Los Angeles,* 36 Cal.2d 95 [222 P.2d 439], and the trial court erroneously refused to follow that decision. We cannot agree.

The Clemons decision went no further than to sustain the ordinance as applied to the particular state of facts established by the agreed statement of facts and the findings of the trial court.

The pertinent facts were the following: Clemons had acquired a bungalow court on Beverly Boulevard in Los Angeles, some 20 years old, containing nine units; by deeds or 99-year leases he subdivided the court into nine parcels, each with a building thereon, and proceeded to sell or lease them separately; two of the units had no access to a street or alley; with each parcel was conveyed an easement over the walkways of the court to Beverly Boulevard; the entire property was serviced by only one incinerator and two sewer

connections. From the facts, "experts in the field of community development" evolved certain theories which impressed the trial court as realities and were carried into the findings. These related to the distressing conditions which the experts envisioned as a result of separate ownership of units in the bungalow court. These opinions of the experts were received as evidence and furnished the foundation of the trial court's findings, which, in turn, were deemed controlling on the appeal. We quote from the opinion (p. 99): "In support of its view that the 'ordinance is an important factor in the orderly development of the city,' the trial court found that the 'attempted cutting up' of such property as plaintiff's bungalow court would 'tend to create and accelerate the creation of slum conditions' and 'overcrowd[ing].' thus 'militating against orderly, quiet and peaceful living'; that 'health and sanitary regulations and laws would be more difficult to enforce' if the bungalow units 'were sold to various separate owners'; and that therefore 'said ordinance has a reasonable relation to the public health, safety and general welfare, and was enacted for the public good.' " Referring to a written opinion of the trial judge the court said (pp. 100-101): "The comment is there made that according to the view of experts in the field of community development, the subdivision of 'bungalow courts into separate parcels' tends 'to create slum conditions' because it would be unlikely that a uniform state of repair would be maintained by the various owners and a 'hodge-podge appearance' would result, with a consequent depreciation in value of the entire property; 'overcrowding' develops because where it is 'a common practice for landlords to limit the number of people who may occupy a bungalow in a court,' such restriction would not apply under separate ownership of the various units, and the probable increase and concentration of people within the limited area would 'add to the noise and other irritations that militate against orderly, quiet and peaceful living'; 'health and sanitary regulations' become 'more difficult to provide for and enforce,' and particularly where such 'close living' in separately owned bungalow units contemplates 'each person . . . constantly making use of easements over the others' property, and where there is no one to make or enforce any rules touching items of common necessity to all, such as, for example, use of incinerators or other disposal of trash, and keeping clean the common walkways,' the situation could create disturbing

tensions. As is further there said, the 'City Council may well have had all these matters in mind in passing the ordinance here under attack and may have concluded that it was necessary in furtherance of the general welfare of the city and its orderly development.' '' And in discussing the case of *Simon* v. *Town of Needham* (population about 16,000), 311 Mass. 560 [42 N.E.2d 516, 141 A.L.R. 688], which upheld a zoning law of the town of Needham prescribing a minimum area of one acre for residential lots, it was said in the Clemons case (p. 101): ''Among the factors considered pertinent in relation to the municipality's power to so regulate the size of house lots in a district which appeared 'admirably suited for one family residences' were the following (p. 518 [42 N.E.2d]): avoidance of 'congestion in the streets'; prevention of 'overcrowding of land'; facilitation in furnishing 'transportation, water, light, sewer and other public necessities'; provision of recreational space for 'children to play'; encouragement of the 'cultivation of flowers, shrubs and vegetables.' '' And at page 100 the court said: ''Where from a consideration of the evidence the trial court has found certain physical facts and conditions to exist in relation to the particular property restriction involved as would justify regulation by the city through the exercise of its police power, all intendments must be indulged to sustain such findings and the resulting judgment.'' And again (p. 104) it was said: ''The various factors above reviewed as found by the trial court to be possible motivating forces in the city's adoption of the ordinance show it to have a reasonable relation to the interests of the community as a whole in establishing a recommended residential pattern through regulation of minimum lot areas under single ownership.''

We have quoted the court's findings on the material facts in the instant case. The properties here involved front on public streets; those in the Clemons case did not; there are separate utility services and customary outbuildings, whereas in the Clemons case there were but two sewer connections and one incinerator for nine units. We now come to a comparison of other factual matters covered by the findings in the two cases. According to expert opinion in the Clemons case, separate ownership would ''tend to create and accelerate the creation of slum conditions.''[1] There was no expert

---

[1]Slum: ''A thickly populated street or alley, especially one marked by squalor, wretched living conditions, or the degradation of its inhabitants.'' (Webster's New International Dictionary, Second Edition.)

testimony on this or any other subject in the present case, which is a fact of considerable significance. Such opinions as were expressed in the Clemons case would have been opposed to the actual conditions shown to exist in plaintiffs' neighborhood. The direct evidence and the findings were that there are actually fewer occupants in the owner-occupied properties than in the rental properties. The owner-occupied properties were kept in better condition. In the Clemons case the experts were of the opinion that if the units were owned separately "health and sanitary regulations and laws would be more difficult to enforce." In the instant case the court was considering actual, existing conditions and found: "Neither public health or sanitary regulations are adversely affected where such corner lots are sold and the residences thereon are occupied by separate owners."

 It is well established that the question whether a zoning ordinance is unreasonable, arbitrary and discriminatory, is related to its application to the particular property involved. It may be valid in its general aspects and as to some properties and invalid as to others. (*Reynolds* v. *Barrett,* 12 Cal.2d 244 [83 P.2d 29]; *Skalko* v. *City of Sunnyvale,* 14 Cal.2d 213 [93 P.2d 93]; *Bernstein* v. *Bush,* 29 Cal. 2d 773 [177 P.2d 913]; *Hagenburger* v. *City of Los Angeles,* 51 Cal.App.2d 161 [124 P.2d 345].) It is settled that the provisions of the ordinance under consideration are generally valid. The question is whether they are valid as applied to conditions as found by the trial court.

The findings of the trial court in the present case of conditions which bear upon the reasonableness of the ordinance and which reflect upon its validity are entitled to the same consideration and weight that was given to the findings in the Clemons case which tended to establish the reasonableness of the application of the ordinance to the Clemons property.

The conditions considered in the Clemons case were novel and they were extreme conditions. Those of the instant case are common and of long duration in the neighborhood. The trial court in our case was not compelled to rely upon theories and opinions of experts, but was dealing with established facts and matters of general knowledge.

 It is of common knowledge among those who are at all familiar with the history of the City of Los Angeles that the section of the city east of the river, approached by Brooklyn Avenue, and known as Brooklyn Heights, is one of the

original sections of the city into which the pueblo expanded. The property herein involved is a part of J. W. Browning's Subdivision of Lots 4 and 5 of Mathews and Fickett Tract, map of which was filed for record August 6, 1886. It was an old and well developed section before Hollywood and Beverly Hills emerged from grainfields and orchards. For at least 75 years the property owners had been permitted to develop the district as it now exists without interference by city authority. There was evidence that the average house is of four or five rooms and its average age from 25 to 35 years, from which it would be inferred that many of them have stood since the early days. Property values have been declining. It was shown by a map in evidence that in the vicinity of the subject property there are 26 corner lots. One of them is occupied by the Jewish Community Center; 13 of them have been divided into separate ownership; eight of the remainder, although not divided in ownership, have two or more houses on them, some as many as four houses; only four remain with a single residence. Where lots have been divided the usual size of the lot is around 50 x 60, or 40 x 70 feet.

This particular zoning regulation, as applied to the Brooklyn Heights area, comes 50 years too late. That section of the city belongs to the citizens who live there. They have built it to suit themselves, as they had a right to do. It was argued to the trial judge that this old district, which has been by-passed by modern development, may sometime become the scene of new and intensive apartment house development, and that the owner of a small parcel might refuse to sell at a fair price and thus "sit back and hold up the economic progress of the area." It was said: "But sometimes people just have eccentricities and they want to live where they have always lived and they are not going to move." We do not recognize this desire as an eccentricity, but as one of the virtues of a sturdy society, to be cultivated and protected, and not throttled by mischievous legislation.

Although zoning measures are essentially prospective in their operation, it frequently occurs that regulations which are primarily designed for the development of new districts are framed in terms which render them applicable to sections of a city that have been fully improved and which cannot be made to conform to an entirely new scheme of development. Application of such regulations must be rea-

sonable. However desirable it may be that each residence be situated on a lot of 5,000 square feet, it would be futile to make that a requirement in a residential district of small houses built on small lots. Although the ordinance provision in question does not except from its operation old settled districts which were developed under different standards, it must be assumed that it was enacted with the understanding that it would not be given effect where the result would be to oppress the property owners without accomplishing any good whatsoever.

We are concerned only with the facts of the plaintiffs' case and the factual conclusions of the trial court. Plaintiff has done nothing out of conformity with the general conditions in his neighborhood. Under the findings the purchaser of the 40 x 50-foot lot has all the usual residential facilities; plaintiff has the same on the 45 x 80-foot parcel which he retained. Many other property owners in the district are in the same situation. Their occupancy interferes in no manner with the health, safety or welfare of the community. They do not have 5,000 square feet for each of their dwellings and are thus prohibited from selling less than all of their property. Plans developed through years of thrift and careful investment would thus be frustrated. The ordinance would stand in the way of a sale of part of a lot to pay off an indebtedness on the whole, or giving a deed to a marrying son or daughter. Such oppression would be beyond reason.

Upon the facts found, the trial court properly concluded that the ordinance provision in question is invalid and unenforcible as to plaintiff's sale of a part of his property or to his ownership of the remainder.

There are other substantial questions as to the power of the city to legislate with respect to transfers of real property and the constitutionality of the ordinance provision in question. We have considered the sole ground upon which the trial court rendered its judgment and deem it unnecessary to decide whether it is sustainable on other grounds.

The judgment is affirmed.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied April 9, 1953, and appellant's petition for a hearing by the Supreme Court was denied May 21, 1953. Gibson, C. J., and Spence, J., were of the opinion that the petition should be granted.