[L.A. No. 31930. Aug. 1, 1985.]

GRIFFIN DEVELOPMENT COMPANY, Plaintiff and Appellant, v. CITY OF OXNARD et al., Defendants and Respondents.

258

**COUNSEL**

Cohen, England, Whitfield & Osborne, Cohen, England & Whitfield, Stanley E. Cohen and Stuart A. Comis for Plaintiff and Appellant.

K. D. Lyders, City Attorney, for Defendants and Respondents.

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Theodora Berger, Assistant Attorneys General, Steven H. Kaufmann and Timothy R. Patterson, Deputy Attorneys General, Natalie E. West, City Attorney (Berkeley), and Penny Nakatsu as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**KAUS, J.**—Appellant, developer and owner of an apartment complex in the City of Oxnard, appeals from a judgment upholding the city's denial of a special use permit for the conversion of the apartments to condominium units. The primary issue is whether a city may—consistent with the requirements of due process—regulate the conversion of apartments to condominiums. If it may, did the city's application of its condominium conversion ordinance result in a "taking" of appellant's property?

We conclude that the ordinance before us is reasonably related to the accomplishment of a legitimate governmental objective within the scope of the city's police power and that denial of the special use permit was not an unconstitutional taking of appellant's property. We will affirm the judgment denying appellant's petition for writ of mandate.

I

In 1979, appellant Griffin Development Company (Griffin) completed construction of a 72-unit apartment complex in the City of Oxnard. When built, the complex complied with all city standards applicable to apartments and condominium projects. Such projects were not then subject to special standards. In 1980, the city adopted new standards applicable to new condominium projects. Through ordinance and resolution, the city applied these new standards to condominium *conversions* as well. The regulations require a special use permit from the city as a prerequisite to conversion; one wishing to convert apartments to condominiums must meet certain mandatory standards and "substantially conform" to the city's advisory standards.[1] Essentially, condominium conversions are subject to standards which apply to the construction of new condominium projects. The conversion regulations are not part of a comprehensive rent control scheme; rental housing in Oxnard is not subject to rent control.

The advisory standards incorporated into the ordinance are set forth in Resolution No. 7658, which applies to new condominiums as well as condominium conversions. The resolution requires, inter alia, that (1) a housing unit shall contain not less than two separate bedrooms; (2) a housing unit shall not be smaller than 1,000 square feet; (3) each unit shall contain adequate space for a washer, dryer, and water heater; (4) parking shall be provided at a ratio of two spaces in a garage per dwelling unit, such parking to be located no further than 50 feet from the unit served; (5) visitor parking shall be required at a ratio of one space per dwelling unit, such parking to be located no further than 100 feet from any unit; (6) major entrances to residences shall be separated from entrances of adjacent units; and (7) a private storage area shall be provided each residence. Requirements (4) and (5) are made mandatory by a provision in Oxnard Municipal Code section 34-226 to the effect that "no apartment building which is a non-conforming use or non-conforming structure because of parking . . . shall be eligible for conversion."

Underlying these standards—which are more severe than those applicable to apartment structures—was the city's conclusion that apartments and owner-occupied condominiums serve two distinct segments of the population,

---

[1] Oxnard Municipal Code section 34-226 distinguishes between *mandatory* and *advisory* physical standards. Certain parking, setback, height, interior yard space and other zoning ordinance standards set forth in Resolution No. 7658 as advisory standards are incorporated into section 34-226 as mandatory standards. Section 34-226 also outlines other mandatory standards. In addition to meeting mandatory standards, the conversion project "shall *substantially conform* to any *advisory standards* for the construction of new community housing projects." (Italics added.) Resolution No. 7658 also sets out the advisory standards.

each with its own needs (e.g., parking requirements) and each imposing a different type of burden on the surrounding community. According to the city's planning director, condominium conversions alter the social matrix of the community, which, in turn, affects the community's growth pattern and need for services. In addition, the city was concerned about the possibility that such conversions would result in a diminution in the supply of available rental units.

Griffin applied for a special use permit to convert its apartment complex to condominiums. It is undisputed that the complex did not conform to the mandatory parking requirements and to five of the advisory standards. Because of this failure to satisfy the requirements for condominium conversion, the city denied Griffin's application, refusing to grant a special use permit, variance, and tentative subdivision map.

Griffin then petitioned for a writ of mandate to compel the city to allow the proposed conversion. There were no disputed issues of fact. The trial court concluded that the city has the authority to regulate condominium conversions and that the applicable regulations—including the requirement of a special use permit—are a valid exercise of that authority. It also concluded that the regulations were fairly applied to Griffin, did not deprive it of its constitutional rights, and are not preempted by the Subdivision Map Act (Gov. Code, § 66410 et seq.).

On appeal, Griffin contends that the regulations are preempted by state law; that the city lacks authority to regulate condominium conversions; and that the regulations effect a confiscatory "taking" of property.

II

Griffin claims that the state Subdivision Map Act (Gov. Code, § 66410 et seq., hereafter Map Act) preempts the city's condominium conversion ordinance. We disagree:

The state Constitution confers upon all cities and counties the power to "make and enforce within [their] limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws.*" (Italics added.) (Cal. Const., art. XI, § 7. See *Santa Monica Pines, Ltd.* v. *Rent Control Board* (1984) 35 Cal.3d 858, 868 [201 Cal.Rptr. 593, 679 P.2d 27].) Local agencies may, therefore, adopt regulations involving matters covered by the Map Act, as long as they are not inconsistent with it. (*Friends of Lake Arrowhead* v. *Board of Supervisors* (1974) 38 Cal.App.3d 497, 505 [113 Cal.Rptr. 539].) Certain provisions of the Map Act do, of course, pertain to condominium conversions. Section 66424, for example,

includes condominium projects within its definition of "subdivision." Tentative and final subdivision maps are required for conversion of five or more units under section 66426. Section 66427 limits the power of local government to disapprove tentative or final maps on the basis of the design or location of the units, *absent an ordinance.*

In any event, the city's condominium conversion ordinance in no way conflicts with these or other relevant provisions of the Map Act. Nor does the Map Act itself evince a legislative intent to occupy the entire field of condominium conversion regulation. Indeed, as we noted in *Santa Monica Pines, Ltd., supra,* 35 Cal.3d at page 869, it affirmatively recognizes the power of municipalities to regulate condominium conversions by local ordinance. (See, e.g., Gov. Code, § 66427.2 ["this section shall not diminish, limit or expand, other than as provided herein, the authority of any city, county, or city and county to approve or disapprove condominium projects"].)[2]

As evidenced by provisions of the Map Act itself, local governments may adopt nonconflicting condominium conversion regulations. Like the regulation at issue in *Santa Monica Pines, Ltd.,*[3] Oxnard's regulations do not conflict with the policies or provisions of the Map Act. Accordingly, we hold that they are not preempted by state law.

## III

Griffin challenges the authority of the city to regulate condominium conversions and, in particular, its power to require a special use permit to convert apartments to condominium units. Its underlying argument is simply that such a conversion involves no "change in use" but, rather, a mere change in the form of ownership. Where there is no "contemplated change

---

[2]See, also, section 66427: "Nothing herein shall be deemed to limit the power of the legislative body to regulate the design or location of buildings in [a condominium project] by or pursuant to local ordinances." For further indication of legislative intent that local government entities maintain the authority to regulate condominium conversions, see sections 66427.1, subdivision (e), 66427.4, and 66452.8.

[3]Unlike Oxnard's regulations, the condominium conversion regulation in *Santa Monica Pines, Ltd.* was connected to the city's rent control laws. In light of the Map Act's recognition of the power of cities to regulate condominium conversions, we held that "[t]he restriction on removal from the rental housing market through condominium conversions . . . with its evident, independent police power source and purpose, is therefore not preempted by the Subdivision Map Act." (35 Cal.3d at p. 869.) Our holding today makes it clear that the issue of state preemption under the Map Act is not affected by the fact that a city's condominium conversion regulations are *not* related to an overall rent control strategy.

in use," according to appellant, the city's requirement of a special use permit amounts to a violation of due process.[4]

Properly framed, the question raised is whether regulation of condominium conversions (which may or may not involve structural alterations) is consistent with the requirements of due process. ■ In *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001], we restated the basic due process limitations on regulations affecting property interests: " 'So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it.' " (17 Cal.3d at p. 155, quoting *Nebbia* v. *New York* (1934) 291 U.S. 502, 537 [78 L.Ed. 940, 957, 54 S.Ct. 505, 89 A.L.R. 1469].)

■ The vast majority of cities and counties in California has adopted comprehensive schemes of land use regulation. Except where such regulations have infringed upon fundamental constitutional rights or relied on suspect classifications such as race, they have generally been upheld in the face of due process and equal protection challenges. Against this background, California courts have consistently treated condominium conversion regulation as a legitimate exercise of the police power. (E.g., *Santa Monica Pines, Ltd., supra,* 35 Cal.3d 858 [condominium conversion regulations upheld as part of city's rent control law]; *Kalaydjian* v. *City of Los Angeles* (1983) 149 Cal.App.3d 690 [197 Cal.Rptr. 149] [ordinance requiring landlords who convert apartments to condominiums to furnish relocation costs to displaced tenants upheld against due process and equal protection claims]; *Soderling* v. *City of Santa Monica* (1983) 142 Cal.App.3d 501 [191 Cal.Rptr. 140] [city's imposition of special requirements with respect to condominium conversion upheld as a presumptively valid exercise of the police power]; *Norsco Enterprises* v. *City of Fremont* (1976) 54 Cal.App.3d 488 [126 Cal.Rptr. 659] [condominium conversion ordinance upheld]. See, also, *Rasmussen* v. *City Council* (1983) 140 Cal.App.3d 842 [190 Cal.Rptr. 1]; *Krater* v. *City of Los Angeles* (1982) 130 Cal.App.3d 839 [181 Cal.Rptr.

---

[4]Griffin offers no support for this proposition other than the fact that the relevant article of the code of the City of Oxnard is entitled "Change of Boundaries and Uses." As for the contention that a condominium conversion not involving major structural alteration constitutes merely a change in ownership and not a "change in use," Griffin cites four out-of-state cases: *Wentworth Hotel, Inc.* v. *Town of New Castle* (1972) 112 N.H. 21 [287 A.2d 615]; *City of Miami Beach* v. *Arlen King Cole Con. Ass'n., Inc.* (Fla.App. 1974) 302 So.2d 777; *Maplewood Village Ten. Assn.* v. *Maplewood Village* (1971) 116 N.J.Super. 372 [282 A.2d 428]; *Bridge Park Co.* v. *Borough of Highland Park* (1971) 113 N.J.Super. 219 [273 A.2d 397].

923]; *Hazon-Iny Development, Inc.* v. *City of Santa Monica* (1982) 128 Cal.App.3d 1 [179 Cal.Rptr. 860].)

■ The standard of judicial review with respect to economic regulation has been clearly established: "[L]egislation regulating prices or otherwise restricting contractual or property rights is within the police power if its operative provisions are reasonably related to the accomplishment of a legitimate governmental purpose." (*Birkenfeld, supra,* 17 Cal.3d at p. 158.)[5] This standard is consistent with the United States Supreme Court's recent observation that "[w]here property interests are adversely affected by zoning, the courts generally have emphasized the breadth of municipal power to control land use and have sustained the regulation if it is rationally related to legitimate state concerns and does not deprive the owner of economically viable use of his property." (*Schad* v. *Mount Ephraim* (1981) 452 U.S. 61, 68 [68 L.Ed. 671, 680, 101 S.Ct. 2176].) ■ However, where a zoning law or other land use regulation infringes upon a constitutionally protected personal liberty or fundamental right, "it must be narrowly drawn and must further a sufficiently substantial government interest." (*Id.,* [zoning ordinance infringed upon First Amendment interests]. See *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219] [city ordinance infringed upon the right to privacy].)

■ Griffin in this case does not claim that the Oxnard condominium conversion ordinance restricts any fundamental right, such as freedom of expression or privacy. Rather, it asserts only that its property interests are adversely affected by the city's denial of a special use permit to turn apartments into condominiums. Our review of the ordinance is therefore limited to the question of whether the ordinance is reasonably related to a legitimate governmental purpose.

Prefatory to our examination of the goals of the ordinance, we note that one obvious purpose in requiring a special use permit for condominium conversions is "to maintain a healthy rental housing inventory." In *Santa Monica Pines, Ltd., supra,* we acknowledged that such restrictions on removal of units from the rental housing market through condominium conversion—even though conversion may not involve a "change in use" in the sense that appellant is apparently using the phrase—possess an "independent police power source and purpose." (35 Cal.3d at p. 869. See, also, *Norsco*

---

[5](See, also, *Dateline Builders, Inc.* v. *City of Santa Rosa* (1983) 146 Cal.App.3d 520, 528 [194 Cal.Rptr. 258].) The various formulations of this standard of review are based upon that stated in *Nebbia* v. *New York, supra:* "If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio."* (291 U.S. 502, 537 [78 L.Ed. 940, 957, 54 S.Ct. 505].)

*Enterprises* v. *City of Fremont, supra,* 54 Cal.App.3d 488, 494-495 [city's regulation of condominium conversion is valid, notwithstanding the fact that the conversion contemplated no physical change in the structure and added no new residents to the city].)

However, beyond the special purpose of preserving an adequate supply of rental housing, the ordinance shares with many other forms of land use control—zoning, height restrictions, etc.—the basic goal of assuring high standards of construction and adequate facilities in developing residential areas.[6] Rationales behind specific standards which differ from those applicable to apartments are set forth in a memorandum from the city's planning director to the city attorney. For example, with respect to the requirement that each unit have two parking spaces in a covered garage not more than 50 feet from the unit, the planning director stated: "Auto ownership statistics reveal that the average owner occupied unit has more than one auto. The City's experience with residential crime shows that a high percentage of such activity occurs in multi-family projects having carports or other open parking and seems to be directly related to auto burglary." Regarding the recommendation that each unit have at least two bedrooms, he reasoned that "Oxnard has shown a consistent statistical trend toward larger families than the County average and a lower median age. [¶] Since condominiums, including conversions, are to provide the mainstream of our owner-occupied housing stock for low and moderate income families, they should have standards which are applicable to families. Therefore, in order to avoid overcrowding, it's been our experience that they should have at least a minimum of two bedrooms."

Griffin has specifically challenged the application of these standards to condominium conversions, arguing that such conversions are merely a change in the form of ownership.[7] Because the conversion involves no "change in use" it is claimed to be unreasonable to apply the standards because they are not sufficiently related to the public welfare. However, this "change in use" approach simply ignores the legitimate concerns which may prompt a city to regulate condominium conversions. The city could reasonably conclude that over a period of time owner-occupied condominiums would serve a segment of the local population with distinct needs.

---

[6]As stated in the preamble to the resolution adopting the advisory standards, such standards "are necessary for the promotion of high quality residential development and for the provision of safe and suitable housing for single family ownership within [the city]."

[7]At oral argument Griffin attempted to attach constitutional significance to the fact that the city conceded that it would be essentially impossible for the 72-unit apartment building to meet the standards set forth in the condominium conversion regulations. In this respect, we perceive no meaningful distinction between Griffin's situation and that of any other landowner whose existing structure—being used for one purpose—cannot be upgraded or modified to meet the standards required for some other use.

Indeed, the planning director indicated this underlying concern in his memorandum: "Regulations which have been developed recognize the basic differences between owner occupied and rental housing. Oxnard and other cities have experienced that in the conversions of units for sale as condominiums, the buyer of that unit has sole discretion with respect to how the unit is occupied, whereas in a rental situation, the manager has a substantial degree of control over the occupancy. Therefore, our condominium standards are necessary to protect not only the buyer of that unit but to protect against overcrowding and impacts that adversely affect other units in the same complex."

As we observed in *Birkenfeld, supra,* the police power "extends to objectives in furtherance of the public peace, safety, morals, health and welfare and 'is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life.'" (17 Cal.3d at p. 160, quoting *Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 485 [234 P. 381, 38 A.L.R. 1479]. See, also, *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 676 [209 Cal.Rptr. 682, 693 P.2d 261].) A city's desire to "grow at an orderly pace and in a compact manner" is clearly encompassed within the concept of "public welfare" (*Dateline Builders, Inc., supra,* 146 Cal.App.3d at p. 528), as is a city's attempt to preserve what it regards as an adequate supply of rental housing.

Our examination of Oxnard's condominium conversion regulations plainly indicates legitimate governmental purposes. Moreover, the operative provisions of the regulations are directly and reasonably related to these goals. We conclude, therefore, that the regulations—reasonably related to legitimate governmental purposes—are a valid exercise of the city's police power.

## IV

Griffin also contends that the city's condominium conversion ordinance, as applied, results in a confiscatory "taking" of property. A land use measure may be unconstitutional and subject to invalidation "only when its effect is to deprive the landowner of substantially all reasonable use of his property." (*Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 277 [157 Cal.Rptr. 372, 598 P.2d 25].)[8] Under this test, Griffin has

[8]Cf. *Agins* v. *City of Tiburon* (1980) 447 U.S. 255, 260 [65 L.Ed.2d 106, 112, 100 S.Ct. 2138]: "The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests [cite omitted] or denies an owner economically viable use of his land, see *Penn Central Transp. Co.* v. *New York City,* 438 U.S. 104, 138, n. 36 (1978)."

failed to make out even a colorable claim that application of the ordinance results in a "taking." Griffin is free to continue to rent its apartments, unaffected by the ordinance; the regulations apply only to its plans to convert the apartments to condominiums.

Moreover, this case does not resemble those in which a city effects a taking through an overly zealous effort to eliminate an existing nonconforming use. ■ We have held that in such cases the city may pursue two constitutionally equivalent alternatives: "It can eliminate the use immediately by payment of just compensation, or it can require removal of the use without compensation following a reasonable amortization period." (*Metromedia, Inc.* v. *City of San Diego* (1980) 26 Cal.3d 848, 881 [164 Cal.Rptr. 510, 610 P.2d 407]. See *Livingston Rock etc. Co.* v. *County of L. A.* (1954) 43 Cal.2d 121, 127 [272 P.2d 4].)[9] ■ In the instant case, however, the city has in no sense attempted to eliminate an existing nonconforming use; the ordinance plainly does not affect Griffin's continuing use of the 72-unit structure as an apartment complex.[10]

Any finding of a "taking" in this case would necessarily be based upon the claim that the regulations result in a diminution of the value of Griffin's property. However, as we noted in *Fisher, supra,* most land use regulations have "the inevitable effect of reducing the value of regulated properties." (37 Cal.3d at p. 686.) Such reduction in property value does not, by itself, render a regulation unconstitutional. "Even a significant diminution in value is insufficient to establish a confiscatory taking. (*Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016] [75 percent reduction in value because of zoning law insufficient to establish a taking]; *Hadacheck* v. *Sebastian* (1915) 239 U.S. 394 [60 L.Ed. 348, 36 S.Ct. 143] [nearly 90 percent reduction in value because of use restriction insufficient to establish a taking].)" (37 Cal.3d at p. 686.) In light of these considerations, it is clear that the city's condominium conversion ordinance does not effect a taking of Griffin's property.

In sum, we conclude that the city's ordinance is not preempted by state law, that it is a legitimate exercise of the city's police power, and that it does not result in a "taking" of property.

[9]The "existing non-conforming use" issue is usually framed in terms of equal protection. (See, e.g., *Metromedia, supra,* 26 Cal.3d at pp. 880-881.) Although it did not raise an equal protection argument in its briefs, Griffin did use the phrase "equal protection" repeatedly during oral argument.

[10]As already noted, Griffin suggested during oral argument that it is somehow significant that the city admitted that it would be virtually impossible for the 72-unit apartment complex to meet the applicable condominium conversion standards. The impossibility of meeting the standards would be relevant to this case only if the ordinance eliminated or substantially interfered with an existing nonconforming use—which it does not.

The judgment is affirmed.

Bird, C. J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**MOSK, J.**—I dissent.

Under the ordinance of the City of Oxnard, the American dream of home ownership has become a nightmare: the city has placed unreasonable barriers in the way of those frugal families who prefer at the end of the year to have an enhanced equity in a piece of real property instead of 12 rent receipts.

To the city fathers of Oxnard the condominium apparently represents a sinister concept, rather than an increasingly popular form of home ownership. The result of this phobia is the ordinance at issue, purportedly regulatory, but conceded by the city attorney at oral argument to be prohibitory in effect. In practicality it is now impossible in Oxnard to convert any apartment building into a condominium complex. The issue is whether there is any rational justification for this drastic curb on property rights. I see none.

An ordinance may validly impose new requirements on property when it is converted from apartments into condominiums only if conversion has adverse effects that justify the imposition of such requirements under the police power. (See Note, *Municipal Regulation of Condominium Conversions in California* (1979) 53 So.Cal.L.Rev. 225, 238-255, and authorities cited [hereafter *Condominium Conversions*].) Put otherwise, "the constitutionality of [the ordinance] under the police power depends upon *the actual existence* of [the adverse effects it is intended to prevent or mitigate] to make [it] a rational curative measure." (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 160 [130 Cal.Rptr. 465, 550 P.2d 1001], italics added.) Here, however, the requisite adverse effects do not appear and the reason is plain: they simply do not exist. "[T]he differences between apartment buildings before and after conversion to condominium ownership are not significant and *do not affect land use.*" (*Condominium Conversions, supra,* at p. 243, italics added.)

The original 72-unit apartment complex constructed by plaintiff satisfied all of Oxnard's health, safety, and welfare requirements. It complied with local zoning restrictions. Conversion of that same complex to a condominium complex involves no change in use—it will still consist of 72 residential units in the same structure. There will merely be a change in the form of ownership. Since the form of ownership can in no way affect the health, safety, or welfare of the city, the prohibitory restrictions imposed here are a violation of due process.

The city is unable to explain how its interests are adversely affected when the same building is occupied by 72 owners in fee simple rather than by 72 tenants who rent from 1 owner. For an example: today the John Doe family occupies the corner apartment on the second floor as a renter; tomorrow the John Doe family occupies the corner apartment on the second floor as an owner. How can that change in status possibly affect the interests of the people of Oxnard? The obvious answer is that it does not.

Because we do not know plaintiff's corporate structure, it is possible that this rental property could be owned by 1 corporation with 72 shareholders; in that event there would in fact be 72 owners of the apartments. Apparently that would be permissible, providing title remained in one corporate name. To so hold exalts form over substance.

The majority rely on planning director's testimony. They fail to realize, however, that his views were not presented to the city council at the time the ordinance was under consideration. His observations are mere transparent rationalizations offered to the court as postadoption apologia. They are groundless, and no more persuasive as an afterthought than they would have been as purported justification for the original action by the council.

The Oxnard ordinance cannot withstand an open-minded analysis. There can be no rational explanation for discriminatorily requiring condominiums to have two separate bedrooms, while rental units may have one or none. There can be no plausible justification for insisting on a 1,000-square-foot minimum size for condominiums, while rental units may consist of substantially less space. The requirement that condominiums must have facilities for washers and dryers is an obviously unreasonable restriction on the freedom of each family to choose whether such appliances fit their budgets and needs. The demand that condominiums provide two garage spaces per unit is based on the arbitrary assumption that all such owners will necessarily have two motor vehicles per family. And the visitor parking requirement implies that only condominium owners, and not renters, will have visitors who arrive by motor vehicle.

In short, the provisions of the ordinance border on the ludicrous. They can be explained only by the candid concession of the city attorney: the city deliberately sought to make condominium conversions a practical impossibility.

Although it was not raised as an issue in this proceeding, the ordinance, which in effect prevents the present property owner from deeding his property to other owners, also appears to violate the prohibition against restraints on alienation. (Civ. Code, § 711.) Since 1872 the law and public

policy of California have frowned on any efforts, whether by deed, will, or law, to restrain the sale, transfer, or alienation of real property. The ordinance inhibits the ability of this plaintiff to sell its existing property to willing and able buyers.

For a discussion of the fundamental issues involved in this ill-conceived ordinance, I adopt as my views the thoughtful analysis of the Court of Appeal, written by Justice Beach and concurred in by Justice Compton and by Presiding Justice Roth in a separate concurrence. Their opinion follows, with the relation of facts, discussion of preemption and a footnote omitted:

### 2. *Constitutional Right of Due Process*

City relies upon the exercise of police power established by common law (*Euclid* v. *Ambler* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016]) and constitutionally authorized by California Constitution, article XI, section 7.

Nonetheless, while the "police power" accords municipalities discretion in enacting local legislation, "[t]he governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited. . . ." (*Nectow* v. *Cambridge* (1928) 277 U.S. 183, 188 [72 L.Ed. 842, 844, 48 S.Ct. 447], cited in *Eldridge* v. *City of Palo Alto* (1976) 57 Cal.App.3d 613, 626 [129 Cal.Rptr. 575].) (See also, *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557, 572 [89 Cal.Rptr. 897].)

The due process and equal protection clauses of the federal and state Constitutions are the chief limitations on the exercise of the police power. (See *Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479]; Rathkopf, The Law of Zoning and Planning, "Police Power" (1980) § 2.02[2]; 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 442, p. 3741.) Article I, section 7, subdivision (a) of the California Constitution, for example, provides that "[a] person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the law; . . ." Accordingly, "where the exercise of that power results in consequences which are oppressive and unreasonable, courts do not hesitate to protect the rights of the property owner against the unlawful interference with his property." (*Skalko* v. *City of Sunnyvale* (1939) 14 Cal.2d 213, 215-216 [93 P.2d 93].) "[T]he zoning power is not a license for local communities to enact senseless and arbitrary restrictions. . . ." (*Moore* v. *East Cleveland* (1977) 431 U.S. 494, 507 [52 L.Ed.2d 531, 542, 97 S.Ct. 1932].) If a zoning regulation goes too far, it will be

recognized as a taking. (*Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393 [67 L.Ed. 322, 43 S.Ct. 158, 28 A.L.R. 1321].)

The constitutionality of zoning as a proper exercise of the police power was well established in *Euclid* v. *Ambler Co.*, *supra*, 272 U.S. 365 and *Miller* v. *Board of Public Works*, *supra*, 195 Cal. 477, 486. But as the court explained in *Miller:* "It is not, however, illimitable and the marking and measuring of the extent of its exercise and application is determined by a consideration of the question of whether or not any invocation of that power, in any given case, and as applied to existing conditions, is reasonably necessary to promote the public health, safety, morals [citations] or general welfare of the people of a community." (*Id.*, at p. 484.) "It cannot be gainsaid, however, that many municipalities, evidently upon the theory that zoning is a panacea for civic ills, have, under the guise of zoning, sought to enact and enforce unreasonable and discriminatory ordinances. Some of these attempted regulations have been palpably for the exclusive and preferential benefit of particular localities. The duty, therefore, devolves upon the courts to determine in each instance whether or not the ordinance, either in whole or in part, is invalid." (*Id.*, at p. 489.)

Accordingly, the California Supreme Court for those reasons has on numerous occasions declared as invalid municipal zoning ordinances that exceeded the police power. (*City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219]; see, e.g., *Roman Cath. etc. Corp.* v. *City of Piedmont* (1955) 45 Cal.2d 325 [289 P.2d 438]; *Skalko* v. *City of Sunnyvale, supra,* 14 Cal.2d 213; *Reynolds* v. *Barrett* (1938) 12 Cal.2d 244 [83 P.2d 29]; and *Matter of Application of Throop* (1915) 169 Cal. 93 [145 P. 1029].) As stated in *Throop* at page 99: "'. . . [M]unicipal bylaws and ordinances . . . are subject to investigation in the courts with a view to determining whether the law or ordinance is a lawful exercise of the police power, or whether, under the guise of enforcing police regulations, there has been an unwarranted and arbitrary interference with the constitutional right to carry on a lawful business, to make contracts, or to use and enjoy property.'" Other courts have also declared zoning ordinances constitutionally invalid. (See, e.g., *Moore* v. *East Cleveland, supra,* 431 U.S. 494 [52 L.Ed.2d 531] [zoning ordinance interfering with family members' occupancy of homes, declared unconstitutional as violation of due process]; *Carlin* v. *City of Palm Springs* (1971) 14 Cal.App.3d 706 [92 Cal.Rptr. 535]; *Del Fanta* v. *Sherman* (1930) 107 Cal.App. 746 [290 P. 1087].)

The foregoing amply illustrates that our review is not to question the wisdom of permissible legislation, but we review because the courts have a

duty to examine the reasonableness of the exercise of municipal police power.

A local police power ordinance is invalid if it is arbitrary, discriminatory, unreasonable, oppressive, not substantially related to the public health, safety or welfare or only marginally serves legitimate purposes while infringing on personal interests protected under due process standards. (*Moore* v. *East Cleveland, supra,* 431 U.S. 494.) We hold the Oxnard [City] ordinance and resolution as applied to appellant are unreasonable, oppressive and not substantially related to the public health, safety or welfare.

We emphasize the standard for review of the fairness and reasonableness of City's exercise of its police power by enactment of the ordinance before us. [That] "standard of review is determined by the nature of the right assertedly threatened or violated rather than by the power being exercised or the specific limitation imposed." (*Schad* v. *Mt. Ephraim* (1981) 452 U.S. 61, 68 [68 L.Ed.2d 671, 680, 101 S.Ct. 2176]; citing *Thomas* v. *Collins* (1945) 323 U.S. 516, 529-530 [89 L.Ed. 430, 439-440, 65 S.Ct. 315]; see also *Moore* v. *East Cleveland, supra,* 431 U.S. 494.)

The ordinance before us requires that one wishing to convert apartments to condominiums meet certain mandatory and advisory physical standards. The advisory standards incorporated into the ordinance are set out in Resolution No. 7658, which was originally enacted to apply to "new residential condominiums" but has since been made applicable to condominium conversions through section 34-266(b) of the ordinance. The resolution requires, inter alia, that (1) a housing unit shall contain not less than two separate bedrooms; (2) a housing unit shall not be smaller than 1,000 square feet; (3) parking shall be provided at a ratio of two spaces in a garage unit, such parking to be located no further than 50 feet from the unit served; (4) visitor parking shall be required at a ratio of one space per dwelling unit, such parking to be located no further than 100 feet from any unit; (5) private patio areas shall be at least 20 percent of the gross floor plan area of the residence; (6) major entrances to residences shall be separated from entrances to adjacent units; and (7) a private storage area shall be provided each residence. Items (3) and (4) are "mandatory" by virtue of municipal code section 34-226 which states "[N]o apartment building which is a non-conforming use or non-conforming structure because of parking . . . shall be eligible for conversion."

These requirements for condominium conversions, on their face, are questionable as unreasonable and overextensive invasions into private family life and choice. (*Moore* v. *East Cleveland, supra,* 431 U.S. 494; *City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d 123.) Although City alleges

that these requirements are related to the public health, safety and welfare, the relation is obscure and unsubstantial. The requirements serve the purposes only marginally. Similar requirements are not imposed on ordinary apartment buildings not owned by the occupants. Yet the effect of rental apartment construction upon municipal services and municipal concerns is not established to be so significantly less as to justify the unequal treatment. Even if valid, there is sufficient evidence in the record to demonstrate appellant's substantial compliance with many of these standards from which the trial court should have concluded that the ordinance and resolution when used to deny the change to tenant ownership, as requested, are unconstitutional as applied to appellant's project.

The standards contained in the ordinance and resolution, even if practical and rational when applied to the construction of a condominium project are clearly illogical, onerous and virtually impossible to meet when imposed on an existing building such as appellant's where a conversion is contemplated.

The wisdom of the ordinance is not a judicial concern, but the reasonable relation of the ordinance to the perceived problems is. The more fundamental and constitutionally protected the right affected by the ordinance, the stricter the scrutiny and the more clear and direct must be the relationship of the measure and the necessity for it. (*Moore* v. *East Cleveland, supra,* 431 U.S. 494; *Schaumburg* v. *Citizens for Better Environ.* (1980) 444 U.S. 620 [63 L.Ed.2d 73, 100 S.Ct. 826]; *Schad* v. *Mt. Ephraim, supra,* 452 U.S. 61, 68 [68 L.Ed.2d 671, 680].)

When a city undertakes intrusive and selective regulation of the otherwise lawful use of property, the usual deference to the Legislature is inappropriate. (*Moore* v. *East Cleveland, supra,* 431 U.S. 494, 499 [52 L.Ed.2d 531, 537].) In such a case it is the city's burden to clearly identify the municipal interest and to justify the ordinance's application to some but not to others yet all of whom are pursuing a right protected by the due process clause of the Fourteenth Amendment. Such justification requires more than mere "rationality."

Although the constitutional interests affected under the claimed right of zoning in the three previously cited United States Supreme Court cases were different than at bench (*Moore* v. *East Cleveland,* right of relatives to live together under the "extended family doctrine"; *Schaumburg* v. *Citizens for Better Environ.,* neighborhood solicitation under "free speech"; and *Schad* v. *Mt. Ephraim* "adult entertainment and nude dancing" under "free speech"), the teachings thereof apply here to a case involving the use of property. Although free speech cases may be more publicized and may be more dramatic, the protection of a person's property against deprivation

without due process is also a constitutional right. Thus, the summary in Justice Blackmun's concurring opinion in *Schad,* relating to zoning laws affecting free speech applies equally well to the issue at bench.

". . . [T]he presumption of validity that traditionally attends a local government's exercise of its zoning powers carries little, if any, weight where the zoning regulation trenches on rights of expression protected under the First Amendment. In order for a reviewing court to determine whether a zoning restriction that impinges on free speech is 'narrowly drawn [to] further a sufficiently substantial government interest,' . . . the zoning authority must be prepared to articulate, and support, a reasoned and significant basis for its decision. This burden is by no means insurmountable, but neither should it be viewed as *de minimis."* (*Schad* v. *Mt. Ephraim, supra,* 452 U.S. 61, 77 [68 L.Ed.2d 671, 685-686].) Paraphrasing Justice Blackmun's further language of *Schad* and applying it here, it is clear that City of Oxnard may not assume ". . . that because the challenged ordinance was intended as a land-use regulation, it need survive only the minimal scrutiny of a rational relationship test, and that once rationality was established, appellants then carried the burden of proving the regulation invalid on [Fourteenth] Amendment grounds. . . . After today's decision, it should be clear that where protected [Fourteenth] Amendment interests are at stake, zoning regulations have no such 'talismanic immunity from constitutional challenge.' [Citation.]" (*Ibid.*)

After the ordinance had been enacted, the City engineer sent the City council, at its request, a letter, justifying the several requirements applicable to condominium conversions alone. In a vague, undocumented and unsupported manner the City engineer stated that purported local experience (without statistics or any evidence) showed that condominium owners owned more automobiles than apartment tenants and were looking for greater amenities, such as more bedrooms, greater storage and patio spaces, thus in his opinion justifying the stricter space requirements imposed on condominiums. That opinion is addressed more to the real estate market rather than to municipal concerns. If condominium buyers are willing to buy existing units, the engineer's belief that some owners may want other amenities is of no concern to the City. The weakness and complete irrelevance of the City engineer's conclusions may be illustrated by common knowledge that there is a great difference among condominiums themselves—even contiguous condominiums, whether they be in one building or in adjoining ones. In fact it is not a rash conclusion to say that some of the individual condominiums which may be constructed in Oxnard per the ordinance may not be as livable as appellant's rental apartments. Nor has lack of parking in the neighborhood been established legislatively by ordinance and there is no judicial basis to find it as a fact. The *conclusions* of a city engineer are

no basis for a lawful use of the awesome authority to deprive one of substantial property rights.

Although a city may rely upon the decision of its engineer in determining whether a particular subdivision map meets the requirements of the Subdivision Map Act and the local general plan, a reviewing court is not bound by the engineer's opinion in determining the reasonableness of the city's exercise of the police power.

In this case, the invalidity of the regulation is patent. A city may not declare that in order for an existing apartment complex to maintain its use it must forthwith comply with the new minimum parking, minimum patio size, separate entrances, storage areas, minimum unit size, and minimum number of bedrooms per unit requirements. Numerous cases have struck down zoning ordinances which attempted to exclude and prohibit existing and established uses for business that were not nuisances. (See, e.g., *Jones* v. *City of Los Angeles* (1930) 211 Cal. 304 [295 P. 14]; *Walnut Properties, Inc.* v. *City Council* (1980) 100 Cal.App.3d 1018, 1022 [161 Cal.Rptr. 411] [a zoning ordinance may not be used to deprive a person of a vested property right]; *Biscay* v. *City of Burlingame* (1932) 127 Cal.App.213 [15 P.2d 784]; *Paramount Rock Co.* v. *County of San Diego* (1960) 180 Cal.App.2d 217, 225 [4 Cal.Rptr. 317]; *Wilkins* v. *City of San Bernardino* (1946) 29 Cal.2d 332, 340 [175 P.2d 542]; *McCaslin* v. *City of Monterey Park* (1958) 163 Cal.App.2d 339, 346-347 [329 P.2d 522] ["'The rights of the users of property as those rights existed under prevailing zoning conditions are well recognized and have always been protected.'"]; *Scrutton* v. *County of Sacramento* (1969) 275 Cal.App.2d 412, 420 [79 Cal.Rptr. 872] ["A zoning ordinance may not immediately suppress or force removal of an otherwise lawful business or use."]; and 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 477, pp. 3774-3775 [a landowner is protected against the retroactive application of an ordinance to lawful uses existing on the effective date of the ordinance].)

3. *The Preserving of Low and Moderate Rental—Purpose of the Ordinance*

One purpose and object of the ordinance is to ensure a certain amount of low and moderate rental housing on the market. The ordinance expressly provides that a conversion permit may be refused if the planning commission finds that the project will remove a substantial amount of low or modest rental housing from the market. But neither City nor the trial court determined that appellant's conversion would have this effect or that this was one of the five advisory standards which appellant did not meet. Nonethe-

less, we do not return this matter for retrial on this issue for the following reasons.

Assuming arguendo that appellant's desire to convert would have the effect of removing low and moderate rentals and further assuming arguendo that providing, or assuring the availability of such rentals is a valid municipal concern, the ordinance still falls short of constitutional standards.

The standard by which the ordinance is tested on review with reference to this assumed-legitimate governmental purpose is still determined by primarily considering its effect on the nature of the right violated—here appellant's nonhazardous, noninjurious use of its property—rather than the power being exercised. As indicated earlier, this is the command of the United States Supreme Court cases discussed above. Here, so tested the ordinance still suffers from the infirmities described earlier.

Even though the consideration of rationality takes a back seat to the consideration of the interest affected, the removal-of-moderate-or-low-income-rentals feature of the ordinance at bench is even less related to the accomplishments of the same professed municipal goals and concerns than was the ordinance in *City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d 123.

The court there held the Santa Barbara ordinance unconstitutionally deprived unrelated tenants of the right to live together under the "right of privacy" under the California Constitution noting specifically that the goals were not reasonably achieved and promoted and therefore did not justify the strict limitation.

Although the language of the opinion deals primarily with the right of privacy and the choice of persons with whom to live and with whom to own monthly tenancies, the decision and holding is bottomed in equal part on the right to possess property. The court's opinion opens with this pronouncement.

" 'All people . . . have inalienable rights', proclaims the California Constitution in the first sentence of article I. The second sentence reads: 'Among these [inalienable rights] are enjoying . . . life and liberty, . . . *possessing . . . property,* and pursuing and obtaining . . . happiness, and privacy.' " (*City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d 123, 126, italics added.)

The opinion then refers to particulars of the ordinance, its restrictions and three exceptions. Justice Newman then states the issue there thus: "Do the ordinance's restrictions, with those three exceptions, respect the commands

of the California Constitution concerning people's rights to enjoy life and liberty, *to possess property,* and to pursue and obtain happiness and privacy?" (*City of Santa Barbara* v. *Adamson, supra,* at p. 129, italics added.)

The general and specifically stated goals of the Santa Barbara ordinance are remarkably similar to the goals and stated propositions of the ordinance at bench and the Oxnard General Plan to which it refers. [Fn. omitted.]

Because in the view of the *Adamson* court, the rights burdened by the ordinance, i.e., privacy and use of property in association with others were fundamental, the court held that the tenuous achievement by the ordinance of the goals listed did not justify the ordinance. The court held the ordinance could not prohibit the use of property for occupancy by more than five unrelated persons. Similarly at bench, the right of owners to own the existing apartments in common with others cannot be prohibited because it will remove some low or moderate rentals. Neither the ordinance nor the evidence before the court demonstrates that either removal or retention of the structure as apartments will increase the areas of valid municipal concern rather than merely change a social or economic condition which is not an area of municipal concern.

If the government has legitimate interest in, and right to make available or to provide, low and moderate rentals, and therefore selects certain property as restricted to that use, the government has, and should exercise the power of eminent domain. It may thus condemn property for such purposes but must pay the owner. It cannot, by masquerading the ordinance with nice and broad language of improving living standards and general welfare, justify burdening the fundamental right of the use of property by forcing the owner to provide such housing any more than it can justify forcing a private property owner to provide any of the other amenities which persons in the community may want or need. (*City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d 123, 137.)

Denial of permission to appellant to convert on the basis that low or moderate rentals will be removed would in effect compel appellant or his successor owners to remain in the apartment rental business. With the presence of a rent control ordinance, this would result in being compelled to do so entirely on City's terms. Whatever one may think of the wisdom of rent control, its effect is simply to limit the amount of profit which a person voluntarily engaged in the business of renting housing may realize on his investment. While rent control may be a lawful exercise of the police power, it does not follow that the property can be limited to, or its owner forced to continue in, such business if the owner desires to get out of it by selling the property.

### 4. *Change of Use*

The unfairness of requiring the owner of a building, which is neither a danger nor a nuisance and which met all requirements when first constructed, to immediately tear down the building or to spend an extraordinarily large amount of money to meet requirements imposed by a change in the law is self evident. City, of course, does not require that. But significantly, City does not require new *rental apartments* to be constructed to meet these conditions although it requires these conditions in construction of new condominiums or in condominium conversion cases. Nor does City require compliance with the new parking and other requirements described when apartments are sold but continue to be used as rental apartments. City asserts that the reason why it may require this of condominium converters alone is because the change of form of ownership is a change of "use."

The conversion of an apartment complex to condominiums does not involve a change in the physical use of the property. It involves only a change in ownership. There appears to be no California decision addressing the specific issue of whether in legal contemplation such a conversion not involving a structural alteration or reconstruction of an apartment house constitutes a change in use. Common sense and fair play seem to make it obvious that it does not and resort to case law would seem unnecessary. Nonetheless, we note at least four courts in states in the eastern part of the United States where the conversion of apartments into condominiums and stock cooperatives has occurred for a substantially longer period of time than it has in California, have reached the conclusion that such a conversion is a mere change in ownership, rather than a change in occupancy or use, and that such a conversion is therefore not subject to regulation under the zoning laws. (See, e.g., *City of Miami Beach* v. *Arlen King Cole Con. Ass'n., Inc.* [Fla.App. 1974] 302 So.2d 777; *Wentworth Hotel, Inc.* v. *Town of New Castle* (1972) 112 N.H. 21 [287 A.2d 615]; *Maplewood Village Ten. Ass'n.* v. *Maplewood Village* (1971) 116 N.J.Super. 372 [282 A.2d 428, 431] ["(I)t is use rather than form of ownership that is the proper concern and focus of zoning and planning regulation."]; *Bridge Park Co.* v. *Borough of Highland Park* (1971) 113 N.J.Super. 219 [273 A.2d 397].)

In *Bridge Park Co., supra,* the court succinctly stated: "Defendant attempts to characterize condominium ownership as a 'use' of land—i.e., since the property in question is to be 'used' as a condominium, the municipality may regulate or prohibit such 'use.' It is apparent, however, that after change of ownership as planned, the same buildings will be on the premises in question and the use to which they are put will also remain the same. We conclude that the word 'use,' as contained in the statute above, does not refer to ownership but to *physical use* of lands and buildings. A

building is not 'used' as a condominium for purposes of zoning." (*Id.*, at pp. 398-399, italics omitted.)

In *City of Miami Beach* v. *Arlen King Cole Condo. Ass'n.*, *supra*, 302 So.2d 777, the acts were almost identical to those in the instant case. There, a hotel/apartment building was constructed with the proper number of parking spots. The city later increased the parking requirements and refused to allow the plaintiff to convert the complex to condominiums because of failure to meet the new parking requirements. The court held that converting from a nonconforming use as apartments to condominiums and changing the type of ownership of real estate upon which a nonconforming use is located would not destroy a valid existing nonconforming use.

We find the reasoning of these decisions persuasive.

By requiring appellant to obtain a special use permit in order to convert the apartment complex to condominiums, City takes the position that the conversion of the dwelling units from apartments to condominiums constitutes a change in use. This is unreasonable and not within the meaning of the word "use" as contemplated in zoning law. This is not a case involving change to a use not conforming to that in the particular zone. Examples of uses that California courts have been found to validly require conditional use permits include: (1) religious synagogue or church in a residential zone (*Stoddard* v. *Edelman* (1970) 4 Cal.App.3d 544 [84 Cal.Rptr. 443]; *Matthews* v. *Board of Supervisors* (1962) 203 Cal.App.2d 800 [21 Cal.Rptr. 914]; (2) jet airplane hangars in a residential zone (*Mitcheltree* v. *City of Los Angeles* (1971) 17 Cal.App.3d 791 [95 Cal.Rptr. 76]); (3) multiple-residential development in a commercial zone (*Concerned Citizens of Palm Desert, Inc.* v. *Board of Supervisors* (1974) 38 Cal.App.3d 257 [113 Cal.Rptr. 328]); (4) a cemetery in residential zone (*Essick* v. *City of Los Angeles* (1950) 34 Cal.2d 614 [213 P.2d 492]); and (5) erection of a radio tower (*McManus* v. *KPAL Broadcasting Corp.* (1960) 182 Cal.App.2d 558 [6 Cal.Rptr. 441]).) But here whether as apartments or condominium units, the property will continue to be used as dwelling units, within the definition of the same municipal code. The manner in which title to the property is held has no bearing on the physical use of the units as dwellings.

Respondent cites *Clemons* v. *City of Los Angeles* (1950) 36 Cal.2d 95 [222 P.2d 439] in support of its view that local zoning ordinances restricting size of lots and spaces, and regulating access to public streets, density of use and promoting aesthetic values are valid exercises of the police power and not unconstitutional denials of the right to use one's property. *Clemons* is entirely distinguishable on the facts. It was not a condominium case. There the property owner was attempting to "cut up" a single parcel of

realty with bungalow units on it into several substandard size lots with one bungalow on each. The zoning ordinance passed long after the units had been built required larger-sized lots. The validity of applying the new zoning ordinance to *Clemons* was premised on the fact that allowing the very small substandard lots and units that would result from the cutting up of the realty would tend to create slums with no or limited access to public streets, sanitary and utility services, and inadequate garbage disposal and incinerator facilities. No such problems exist here. The apartment building at bench is well built, and does not present slum, fire, traffic, health or other problems.

Also, in *Clemons* there was a span of some 25 years or more between the time the apartment units were built and the date of the request to cut up the lot on which they stood. It is reasonable to presume that in such a period of time there were many changes in urban life in the city and an increase in the demands on municipal services. The facts, problems and issues at bench are totally different than in *Clemons*. That case is inapplicable here. The holding of *Clemons* is limited to the situation where the substandard size lots actually create or increase additional problems of providing police, fire and other vital municipal services. It does not apply to prevent transferring ownership of lots or units which existed before a new ordinance but were technically thereafter nonconforming in size but where such feature does not create or add to such problems. (*Morris* v. *City of Los Angeles* (1953) 116 Cal.App.2d 856 [254 P.2d 935].) At bench appellant built in good faith according to the requirements in effect in 1978-1979. It does not seem likely that the method of providing municipal services nor neighborhood needs changed so drastically in the two years between the completion of construction and the time of the request to permit condominium conversion as to justify the more stringent requirements imposed on condominiums only and not on apartments. [End of Court of Appeal opinion.]

I would reverse the judgment.

Lucas, J., concurred.